[Cite as *In re M.B.*, 2014-Ohio-4837.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

## JOURNAL ENTRY AND OPINION
### Nos. 101094, 101095, and 101096

## IN RE: M.B., ET AL.

## Minor Children

[Appeal by Mother, J.C.]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 10921733, AD 10908657, and AD 12909935

**BEFORE:** Stewart, J., Celebrezze, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** October 30, 2014

**ATTORNEY FOR APPELLANT**

Jeffrey R. Froude
P.O. Box 771112
Lakewood, OH    44107

**ATTORNEYS FOR APPELLEE CUYAHOGA COUNTY DIVISION OF CHILDREN AND FAMILY SERVICES**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Mark Adelstein
Assistant County Prosecutor
Cuyahoga County Division of Children and Family Services
8111 Quincy Avenue, Room 450
Cleveland, OH    44104

**ATTORNEY FOR FATHER, P.B.**

Sofia Teren
P.O. Box 22426
Cleveland, OH    44122

**ATTORNEY FOR FATHER, Je.C.**

Theodore Amata
5403 Detroit Avenue
Cleveland, OH    44102

**GUARDIAN AD LITEM FOR CHILDREN**

Wildon V. Ellison
12020 Lake Avenue, Suite 205
Lakewood, OH    44107

MELODY J. STEWART, J.:

{¶1} Appellant-mother J.C. ("Mother") appeals from a juvenile division order that placed her three children, K.M.J.C., M.B., and S.B., in the permanent custody of appellee Cuyahoga County Department of Children and Family Services (the "agency"). She complains that the court erred by allowing a psychologist who examined her to testify to statements she made; that the court erred by proceeding with trial in her absence; and that the court erred by finding that the agency satisfied the requirement that it engage in reasonable and diligent case planning as a prerequisite for seeking permanent custody. We have expedited the hearing and disposition of these appeals as required by App.R. 11.2(C).

I

{¶2} The children in this case have different fathers. K.M.J.C. (born May 19, 2008) was fathered by the mother's husband, Je.C. ("Husband"); M.B. (born November 19, 2010) and S.B. (born June 12, 2012) were fathered by P.B. ("Father"). When M.B. and S.B. were born, Mother was still legally married to Husband but living with Father.

{¶3} In 2010, the agency sought temporary custody of K.M.J.C. on allegations that Mother and Husband had a history of domestic violence (Husband had pleaded no contest to charges of child endangerment), Mother lacked stable housing, and both Mother and Husband had a history of mental health issues. Mother admitted the allegations of the complaint and the agency prepared a case plan with a goal of reunification.

{¶4} The agency believed that Mother did not make adequate progress on the case plan. Just a few months after the second child, M.B., was born, the agency obtained temporary custody over her on Mother's admission that she had insufficient income to provide for the child; she continued to endure domestic abuse from Husband; that Father had a history of domestic

violence; and that she had been diagnosed with depression and post-traumatic stress disorder. Again, the agency adopted a case plan calling for reunification.

{¶5} Mother failed to complete the goals of either case plan, so the agency filed motions for permanent custody of both K.M.J.C. and M.B. While those motions were pending, Mother gave birth to S.B. The agency took emergency possession of S.B. at birth after the child was declared dependent on allegations that Mother and Father were in an abusive relationship; Father had three other children from another relationship who were committed to the legal custody of a relative; and that Mother, although compliant with counseling and medication, had mental health issues. The agency then filed a separate complaint seeking permanent custody of S.B.

{¶6} All three complaints for permanent custody were joined for trial. In findings of fact, the court stated that Mother and Husband had a verbally and physically abusive relationship. Mother's relationship with Father was likewise domestically violent. The court found that although Mother completed parenting and domestic violence classes, she did not benefit from them as shown by her continued relationship with Father. The court found Mother lacked stable income and relied upon Father to provide for her needs. Mother's mental condition remained a serious concern — in May 2013, she received emergency care after threatening to harm herself. The court found that her history of depression and post-traumatic stress disorder left her "unable to provide for the needs of her child or keep herself safe." The children were doing well in foster care and were "very bonded" in their foster home.

{¶7} Based on this evidence, the court found that notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents, the parents failed to remedy the conditions that caused the children to be removed from the home. It further found that the

parents, by their actions or inaction, showed an unwillingness to provide an adequate, permanent home for each child.

II

{¶8} During trial, the court called as its own witness a psychologist whom it charged with evaluating Mother. The psychologist testified that she had been told to evaluate Mother with emphasis on unresolved issues Mother may have related to sexual abuse she suffered "when she was younger" and to determine the extent of domestic violence in Mother's relationships. The psychologist was about to testify to responses the mother gave in answer to questions about her family history when Mother's guardian ad litem objected. The guardian ad litem claimed that Mother's cooperation with the psychologist, whom he characterized as an "interrogator for the State," had been forced as a condition of retaining custody of her children, so she did not validly waive her right to remain silent.

A

{¶9} By its own terms, the Self-Incrimination Clause of the Fifth Amendment to the United States Constitution, as held applicable to the states, applies only to criminal cases: "No person * * * shall be compelled in any criminal case to be a witness against himself  * * *." Section 10, Article I, Ohio Constitution is similarly applicable only in criminal proceedings: "No person shall be compelled, in any criminal case, to be a witness against himself." The rule applies in civil proceedings to the extent that compelled testimony "may tend to incriminate" the witness in a future criminal proceeding. *Tedeschi v. Grover*, 39 Ohio App.3d 109, 111, 529 N.E.2d 480 (10th Dist.1988). In this context, "incrimination" means not only evidence that would directly support a criminal conviction, *Cincinnati v. Bawtenheimer*, 63 Ohio St. 3d 260, 264, 586 N.E.2d 1065 (1992), but "information which would furnish a link in the chain of

evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution." *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

{¶10} There is no question that this parental rights case is a civil proceeding. *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 13-14, 399 N.E.2d 66 (1980). What is more, Mother makes no claim that any statements the psychologist testified to would expose her to prosecution in a criminal proceeding. We therefore conclude that the court did not violate Mother's right against self-incrimination by allowing the psychologist to testify to statements Mother made in the course of a mental health evaluation ordered by the court.

B

{¶11} To support her arguments, Mother cites a litany of rules — Juv.R. 29(C); Juv.R. 34; Evid.R. 702; Evid.R. 703; and Evid.R. 804 — but it is unclear how these rules are applicable to her argument. As she states in her brief:

> The questions then advanced is [sic] what is the nature of a court ordered psychological evaluation and may the medical professional repeat statements made by the party in testimony in a permanent custody hearing. Defense relies on Mother's constitutional right to remain silent and against self-incrimination as expressed in the Fifth Amendment to the U.S. Constitution and Section 1.10 [sic] of the Ohio Constitution.

Appellant's Brief at 14.

{¶12} The "nature" of the psychological evaluation was that it was conducted pursuant to Juv.R. 2(W) as a "mental examination" by a psychiatrist or psychologist. This is contrary to Mother's assertion that the evaluation was a "social history" for purposes of Evid.R. 804(B)(4), for which her unavailability was a prerequisite for testimony to be admissible.

{¶13} The distinction here is that Evid.R. 804(B)(4) applies to matters like birth, adoption, marriage, ancestry, or "other similar fact of personal or family history."   The question asked of the psychologist — "did you have an opportunity to review family history as it related to [mother]" — was not a question concerning the historical record of Mother's family, but a question based on the referral from the court regarding the extent of domestic violence in Mother's childhood and relationships.   For that reason, Evid.R. 804(B)(4) is inapplicable.

{¶14} Mother has no viable complaint that she was unaware that   statements she made in the course of the evaluation were to be used in forming a diagnosis and might also be used in the pending legal proceedings.   The psychologist testified that Mother was fully aware that statements she made during the examination could be used in the custody proceeding:

> [Mother] was informed of the nature and purpose of the evaluation.  She was informed of the inherent limits of confidentiality including that the evaluation would be viewed by individuals at DFCS and those involved in her court case. This examiner also instructed her that she had the right to not answer all questions or to participate but that, should she choose not to, this information would be reported to the referring parties.   She demonstrated an understanding of the information that was presented to her.   For example, she recited where the report would be sent, that she did not have to participate, and that she could stop at any time.   She agreed to proceed with the evaluation.

{¶15} Mother's consent to these conditions compels the conclusion that the psychologist could recount statements Mother made during her examination because those statements were nonhearsay admissions by a party-opponent under Evid.R. 801(D)(2).   What is more, even if considered hearsay, the statements would have been admissible under the Evid.R. 803(4) hearsay exception for statements made for the purposes of medical diagnosis.   *See State v. Durham*, 8th Dist. Cuyahoga No. 84132, 2005-Ohio-202, ¶ 32 (statements made by child in evaluation by psychotherapist on direction of juvenile court in custody case admissible in rape case because they were made as part of child's treatment).   Mother's family history was given in the context

of a court-ordered psychological evaluation. That family history was important to understand the scope of domestic violence suffered by Mother and diagnose Mother's mental condition.

{¶16} We note that the guardian ad litem for Mother conceded at trial that if Mother's statement of family history was "made with regards [sic] to treatment, then it's admissible." Tr. 223. Against all indications to the contrary, the guardian ad litem characterized Mother's psychological evaluation as an "interrogation." The court made short work of that characterization:

> It was submitted to this Court that each parent had a psychological issue. * * * This Court asked precisely, what was her mental health issue? No one could answer the Court. Therefore, I, on my own motion, said everyone is going down to the clinic so we can find out what mom's issues are.

{¶17} The court's remarks convincingly refute Mother's allegation that she was sent for "interrogation." The psychological referral was to evaluate and diagnosis her mental condition. The statements of family history, most particularly her past history as a victim of sexual assault and domestic violence, were integral to any diagnosis. Those statements were thus admissible.

### III

{¶18} During trial, the court recessed, stating "one of the parents has bed bugs and there has been an infestation of beg bugs that have been reported on the parents." When the court reconvened the following day, the assistant prosecuting attorney told the court that Mother and Father had "quite a few bed bug bites." After discussing options for ridding their dwelling of bed bugs, the court said that it would take a two-week recess and "if the parents have not solved the issue of their bed bugs, then they will be excused from trial." When the court reconvened some five weeks later, Mother was not present. The court noted that although Mother had taken steps to eradicate the bed bug problem, it had no documentation from her showing that her home

was habitable. It acknowledged that there had been prior "beg bug issues in this courthouse" and said that it wished to "keep the public safe." It held out the possibility of a video conference and asked counsel to contact their clients. It said that if Mother and Father were "cleared of health issues, they are more than welcome to come on Monday, but I need some documentation." Over objection, the court proceeded with trial. Mother finally rid her dwelling of bed bugs in time to attend the second-last day of trial, but contracted conjunctivitis, causing the court to once again bar her from the courthouse due to public safety concerns. Trial concluded before her health permitted her to return. Mother argues that the court's actions unconstitutionally deprived her of her right to attend trial.

{¶19} Mother prefaces her argument on her right to be present at trial by noting that the termination of parental rights has been compared to the "death penalty," so by inference, she argues that she is entitled to the protections of Crim.R. 43(A) that guarantees a criminal defendant the right to be present at all stages of trial.

{¶20} It is true that the Ohio Supreme Court has said that "[p]ermanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents 'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (8th Dist.1991). But that statement was intended only to underscore the seriousness of the loss of parental rights, not to suggest that parties facing the loss of their parental rights had the same rights as criminal litigants. We earlier noted that permanent custody cases are civil in nature. Therefore, the statutory and constitutional rights afforded to the accused in a criminal case do not apply to parental rights cases.

{¶21} Although basic due process guarantees a civil litigant the right to be present at trial, that right is not absolute. For example, we have long held that an incarcerated party has no right to attend trial in a civil proceeding. *See Mancino v. Lakewood*, 36 Ohio App.3d 219, 221, 523 N.E.2d 332 (8th Dist.1987). The court has the authority to control the manner in which trial is conducted, and when it believes that a person poses a threat to the health and safety of others, it may remove that person from the courtroom until such time as the threat to health and safety is ameliorated.

{¶22} The court made it clear that Mother's infestation of bed bugs created a "public health emergency." Mother does not contest that her circumstances posed a threat to the health and safety of the court and we have no difficulty in concluding that it did. Granting a continuance of trial based on public health and safety was well within the court's inherent authority. *See State ex rel. Buck v. McCabe*, 140 Ohio St. 535, 45 N.E.2d 763 (1942), paragraph one of the syllabus.

{¶23} With the purpose behind the continuance — the abatement of the bed bug infestation — unresolved after an initial continuation of trial, the court did not abuse its discretion by refusing to further continue trial. The court gave Mother five weeks to resolve the bed bug problem and Mother failed to offer any explanation as to why this amount of time was not sufficient for her to correct the problem. In fact, the court learned that although Mother moved from the premises when the bed bugs were discovered, she later returned despite the problem not having been eradicated. While it is true that she rented the premises and it appeared that her landlord may have been the person responsible for eradicating the infestation, the court could reasonably have found that her absence from the premises would have rendered her able to return to trial. By voluntarily returning to the premises, Mother arguably showed that she was

not making her best effort to remedy the condition that caused the continuance. The court would have been justified at a point in finding that the continued infestation was Mother's fault and no additional continuances were warranted.

{¶24} When Mother finally did prove herself free of bed bugs, she contracted conjunctivitis, a highly contagious bacterial infection. *See* http://www.cdc.gov/conjunctivitis/clinical.htm (accessed October 2014). As with the bed bug infestation, the court was within its discretion to bar Mother from the courtroom until such time as she no longer posed a threat to the health and safety of those in the courthouse.

{¶25} In finding that the court did not abuse its discretion by barring Mother from the courthouse for health and safety reasons and refusing to grant additional continuances, we recognize that the court placed great emphasis on concluding the trial in a timely manner. It noted that the children had been in predispositional temporary custody of the agency for as long as three years and that the "need for permanency for the children outweighed the right of the [mother] to be present." It is difficult to take issue with this conclusion. Trial in this case commenced on May 17, 2013, Mother was found to be infested with bed bugs on September 18, 2013 (on the tenth day of trial), the court conducted an attorney status conference on October 9, 2013, to determine whether the public health issue had been abated (there was no proof that it had been abated), and resumed trial on October 24, 2013, in Mother's absence. On October 29, 2013, Mother was certified safe to return, but had contracted conjunctivitis. Trial concluded October 31, 2013.

{¶26} The court did not abuse its discretion by balancing Mother's right to attend trial with the need for speedy disposition of the complaint for permanent custody. The five weeks given to Mother to make herself fit to be present in the courtroom was a generous amount of

time. Trial had stretched out for months and there were no assurances at the time that the court decided to go ahead with trial that Mother was capable of attending trial such that she would not jeopardize the health or safety of those present in the courtroom.

IV

{¶27} When granting the agency's motion for permanent custody of the three children, the court found that despite reasonable case planning and diligent efforts by the agency to assist the parents in remedying the problems that initially caused the children to be placed outside the home, Mother had failed continuously and repeatedly to substantially remedy the conditions that caused the placement. Mother argues that the court reached this conclusion in error because the court itself stated on the record that "I do have to say that Children and Family Services did not do as good of a job as they could have by offering services to this family." Mother argues that this statement, coupled with testimony by various social workers involved in the case to the effect that she would have benefitted from counseling and one-on-one parenting training, prove that the court's finding is against the manifest weight of the evidence.

{¶28} The court granted the agency permanent custody of the children, stating:

The Court further finds that based on the relevant evidence, the child cannot be placed with either parent within a reasonable time. Following the placement of the child outside the home and notwithstanding reasonable case planning and diligent efforts by the Agency to assist the parents, the parents have failed to remedy the problems and have demonstrated a lack of commitment toward the child by failing to regularly support, visit or communicate with the child when able to do so. The Parents have further by their actions and inaction, have [sic] shown an unwillingness to provide an adequate permanent home for the child.

{¶29} R.C. 2151.412 requires a children's services agency to prepare a case plan for any child over whom the agency had temporary or permanent custody. The "general" goals of a case plan for children in the temporary custody of a children's services agency is to achieve,

consistent with the best interest and special needs of a child, "a safe out-of-home placement in the least restrictive, most family-like setting available and in close proximity to the home from which the child was removed or the home in which the child will be permanently placed" and "[t]o eliminate with all due speed the need for the out-of-home placement so that the child can safely return home." R.C. 2151.412(G).

**{¶30}** The successful completion of a case plan "is not dispositive on the issue of reunification." *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). Indeed, "[a] parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself." *Id*.

**{¶31}** The case plan adopted by the agency called on Mother to obtain stable housing, be free of domestic violence; get mental health treatment; domestic violence counseling; and a stable income. The court found that she failed to satisfy any of these requirements. She had no stable housing; in fact, at the close of trial her own attorney was unsure of where she resided. Mother likewise failed to establish a stable income and continued to rely on Father to provide for her. Her reliance on Father to provide for her needs put her at his mercy and continued what all experts believed was an abusive relationship. Although Mother did receive mental health counseling for post-traumatic stress disorder, she told the psychologist that she was not participating in mental health counseling at the time of trial. She ceased counseling despite being given referrals as part of the case plan.

**{¶32}** Mother did complete her domestic violence counseling, but the court could find it did not fulfill the case plan requirement because she continued to reside with Father and expose herself to his abuse. In addition, Mother continued to suffer verbal and physical abuse from

Husband. From this evidence, the court could conclude that completion of the domestic violence counseling component of the case plan did not eliminate the conditions that caused the children to be removed or the need for continued out-of-home placement.

{¶33} As Mother points out, the court made statements on the record noting its dissatisfaction with the agency's case planning. The court stated:

> I do have to say that Children & Family Services did not do as good of a job as they could have by offering services to this family. And I want that on the record because I want the next case to have the family have all the services and referrals that they needed. And I don't think Children & Family Services did the job that they were supposed to do.

Tr. January 13, 2014, at 5.

{¶34} It is unclear from the transcript why the court believed that the agency could have done a better job offering services to the parties. Not only did it fail to elaborate on the agency's shortcomings, it almost immediately stated on the record that it found the agency made "reasonable case planning and diligent efforts" to assist Mother in remedying the problems that caused the children to be placed outside the home. *Id.* at ¶ 6. It appears that the court was concerned that the agency could have done more for Mother in pursuit of a goal for reunification. But believing that the agency could have done more is not the same as saying that the agency did not do enough. On this basis, the court's finding that the agency made reasonable and diligent case planning efforts were not against the manifest weight of the evidence.

{¶35} Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas — Juvenile Division to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the

Rules of Appellate Procedure.

_____
MELODY J. STEWART, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR