[Cite as *In re K.T.*, 2023-Ohio-1288.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE K.T. | : | |
| | : | No. 111996 |
| A Minor Child | : | |
| | : | |
| [Appeal by CCDCFS] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** April 20, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD19914705

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, Anthony R. Beery and Zachary J. LaFleur,
Assistant Prosecuting Attorneys, *for appellant*.

Gregory T. Stralka, *for appellee*.

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Appellant Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency") brings the following appeal challenging the decision of the Cuyahoga County Court of Common Pleas, Juvenile Division's decision granting legal custody of K.T. (d.o.b. 01/16/2019) to S.T. ("Father") and denying the agency's motion for permanent custody. After a thorough review of the law and facts, we

reverse the decision of the juvenile court granting legal custody to Father; reverse the decision denying the agency's motion for permanent custody; and remand.

## I. Factual and Procedural History

{¶ 2} In December 2019, the agency filed a complaint requesting temporary custody of K.T. and his two older siblings,[1] alleging that the children were abused, neglected, and dependent. The children were residing with K.G. ("Mother"), the biological mother of all three children, and Father, the biological father of K.T. K.T., who was less than a year old at the time the complaint was filed, was observed with "injuries to his forehead." K.T.'s siblings were observed with injuries consistent with being hit with a cord. Regarding Mother, the complaint alleged that Mother "has an anger management problem" and "hits the children with cords and throws objects at the children." There were also hygiene concerns; the children "lacked clean clothing and smelled of urine." Regarding Father, the complaint alleged that he was "overwhelmed with the care of the children" and "lacks appropriate judgment with which to provide for the children," noting that he "minimizes the injuries to the children and the lack of hygiene in the home."

{¶ 3} The court granted the motion for predispositional emergency temporary custody, ordered Mother to have no contact with the children due to the physical abuse allegations, and ordered the agency to file a case plan. After a

---

[1] K.T.'s two older siblings, K.F. (d.o.b. 11/13/2014) and T.F. (d.o.b. 11/02/2016), were permanently committed to agency custody. Mother has separately appealed K.F. and T.F.'s disposition in *In re K.F., et al.*, 8th Dist. Cuyahoga No. 112086.

temporary placement, the children were placed with Mother's godparents ("the foster parents"), where they remained for the pendency of the proceedings.

{¶ 4} The agency filed a case plan in January 2020, requesting that Father complete services for parenting and individual counseling with the ultimate goal of reunification with the children. Father was allowed weekly supervised visitation with the children.

{¶ 5} In October 2020, the agency filed an amended complaint for temporary custody, alleging that since the initial complaint, Mother had been criminally charged with endangering children and domestic violence in relation to the injuries observed on K.T. and his siblings.

{¶ 6} In December 2020, the court found that the children, including K.T., were neglected, abused, and dependent. The court proceeded immediately to disposition, placing the children in the temporary custody of CCDCFS and approved the case plan with the ultimate goal of reunification with the children. The court also lifted Mother's no-contact order.

{¶ 7} In January 2021, the agency moved to extend temporary custody to June 9, 2021, noting that Mother and Father required more time to complete the case plan. Particularly, the agency specified that Mother needed more time to rebuild her relationship with the children since the no-contact order had been lifted. The court granted the motion.

{¶ 8} In May 2021, the agency moved to extend temporary custody for a second time, this time to December 9, 2021. The agency noted that though

substantial progress had been made on the case plan, the risk to the children had not been sufficiently reduced. Particularly, K.T.'s siblings feared Mother and were still exhibiting trauma associated with Mother's past abuse of them. The court granted this second motion to extend temporary custody.

{¶ 9} In November 2021, the agency moved the court to modify temporary custody and place all three children in the permanent custody of the agency. Attached to this motion was an affidavit from CCDCFS Social Worker April Palidar ("Palidar"), who averred that Mother's criminal case stemming from the abuse of the children was closed because Mother failed a drug test and was discharged from probation; that K.T.'s siblings were still fearful of Mother; that Mother had been inconsistent in attending mental health services; that Father lacked appropriate housing to provide for K.T.; and that Father and Mother are in "an unstable and volatile relationship which impacts their ability to provide for the basic and emotional needs of the children."

{¶ 10} In February 2022, Father moved the court for legal custody of K.T., citing consistent, reliable compliance with the case plan throughout the pendency of the proceedings. Notably, the motion included an affidavit from Father who averred that at the expiration of his lease with Mother on March 1, 2022, Father would be separating from Mother and leaving the premises to reside with his own mother in a two-bedroom apartment. Father also averred that he initially maintained his relationship with and resided with Mother to assist her in the completion of her case plan, but now realizes that this was not in the best interest of K.T. or his siblings.

Father also indicated that though he was not currently employed, he had submitted several applications for employment and makes ends meet by performing various handyman tasks.

{¶ 11} The juvenile court held a hearing on Father's motion for legal custody and CCDCFS's motion for permanent custody on July 1, 2022.

{¶ 12} At the start of the hearing, Mother's counsel conceded that Mother was mindful that K.T.'s two siblings expressed their wishes to remain with the foster parents permanently. Mother's counsel noted, however, that K.T. was too young to express his wishes and that Mother supported Father's motion for legal custody, or, in the alternative, desired legal custody herself.

{¶ 13} Father's counsel opened by noting that while K.T.'s two siblings remain traumatized as a result of Mother's inability to control her anger, K.T. had not. K.T. was less than a year old when the complaint was filed and did not have the same lingering responses to trauma and fear of Mother that his siblings have. Father's counsel further noted that the affidavit supporting Father's motion for permanent custody was no longer totally accurate; since that time, Father had rekindled his relationship with Mother.

{¶ 14} The children's foster mother testified that all three children exhibited emotional stability when visitations were only with Father, but that changed when Mother's no-contact order was lifted and began joining the visitations. Prior to visitations where Mother would be present, K.T.'s siblings "acted out" and required reassurance that Father was also going to be present. She testified that Father was

interactive and playful during visitations and that Father rarely missed visits, though her contact with him became more sporadic in March 2022 when he began working full time during the week. The foster mother detailed the trauma responses that K.T.'s two siblings were regularly experiencing as a result of Mother's abuse such as bedwetting and other symptoms of anxiety but testified that K.T. was not exhibiting these same behaviors, likely due to his young age when the abuse occurred. When questioned by the children's guardian ad litem ("GAL"), the foster mother testified that if Father received permanent custody of K.T., she would not be concerned that Father would abuse the children, but noted that Father exhibits deficiencies regarding managing "day-to-day things" and "sometimes not paying attention." (Tr. 53.) She also noted that she did not agree that Father should receive custody of K.T. if Father remained in a relationship with Mother. She further answered that K.T. had spent his entire life with his siblings, was bonded with them, and that K.T.'s siblings may feel frustrated or confused if Father received custody of just K.T., noting that the siblings may feel that Father "chose" K.T. over them.

{¶ 15} The children's licensed professional counselor, Kelsey Cirkvencic ("Cirkvencic"), also testified. Cirkvencic is the therapist for K.T.'s siblings and works with them to address their posttraumatic stress disorder related to trauma from the physical abuse inflicted by Mother. Cirkvencic did not engage in any services with K.T. due to K.T.'s age. She testified that Father engaged with K.T.'s siblings during their sessions and was very involved and concerned for the children's well-being.

{¶ 16} Palidar, the CCDCFS employee and social worker who was assigned to the case, testified that she was assigned the case in December 2020 after the previous case worker left the agency. Palidar discussed Mother's criminal charges. Mother pled guilty to three counts of child endangering and one count of domestic violence for the injuries that led to the removal of the children. All three children were listed on the indictment. After pleading guilty, Mother was sentenced to probation. Nonetheless, Mother was unsuccessfully discharged from probation after she failed a drug test. Palidar testified that "after she was discharged from probation, she went back in front of the Judge and her case was closed, so she therefore had no consequences for the physical abuse that the children suffered[.]" (Tr. 80.)

{¶ 17} Palidar testified that Father was overwhelmed with trying to provide for the family and as a result, was not home often and "had no knowledge of the abuse that the children were suffering." (Tr. 82.) It was hard for Palidar to believe that Father was unaware of the abuse the children were facing because the children reported that the abuse was consistent; because there were multiple injuries on all of the children; and because even if he never noticed the abuse or the visible injuries, that in and of itself is concerning.

{¶ 18} Mother and Father were eventually approved for unsupervised visitation, but Palidar was hesitant to move the visits to Mother and Father's home due to the clutter and sanitation concerns. In the winter, the home had plumbing and furnace issues, and despite repeated assurances from Mother and Father that

they would improve the condition of the home, Palidar never observed any improvements. Mother and Father also told Palidar that they had plans to move to a new home, but this never happened either.

{¶ 19} When asked about Father, Palidar stated that she could not say that Father was reliable because he had missed visits for the past few months. She stated that she was concerned about Father's relationship with Mother, noting that the couple were frequently breaking up and getting back together. Several times during Palidar's involvement with the case, Father communicated that he was done with Mother and moving out, but he would just as quickly renege and rekindle the relationship. She testified that she informed Father throughout the pendency of the case that as long as he was involved with Mother, he would be ineligible to get custody of K.T. Father took this advisement seriously and eventually moved in with his own mother and provided the address to Palidar, but she was never able to walk through Father's new residence. In fact, she testified that closer to the date of trial, Father had been avoiding her and when she confronted him about his sudden noncompliance, he informed her that he did not want her to come to his mother's apartment. At the time of trial, she understood that Father and Mother were back together and though they were not living together, they were looking for a home to move into together.

{¶ 20} Palidar testified that during visitation, the children were all very engaged with Father. The children looked forward to visits with Father and were more engaged with Father than they were with Mother. She noted that K.T. does

not seem to exhibit any of the concerning trauma-response behaviors that the other two siblings demonstrate before, during, and after visitation.

{¶ 21} Regarding Father's motion for legal custody, Palidar noted that she had some concerns about separating the children and Father's inability to confidently make decisions based on his past relations with Mother. She is especially concerned that Father is looking for housing with Mother, which would put K.T. right back into Mother's care if Father continues to work long hours that do not allow him to be present in the home. Palidar noted that even though Mother was fully compliant with the case plan, she did not believe that Mother had benefitted from the services, mostly citing the fact that K.T.'s siblings, even after months of unsupervised visitation, still exhibit concerning, fearful, and traumatic responses to Mother's presence; refuse to engage in counseling with Mother; and indicated that they wish to remain with the foster parents permanently. Finally, Palidar noted that Father had said inappropriate things to the children in a moment of frustration, including telling the children that he was done with this case and never going to see them again.

{¶ 22} Palidar ultimately testified that she felt that it was in the best interest of all three children to be placed with the foster parents permanently, who had expressed an intent to adopt the children.

{¶ 23} Father testified on his behalf. Father testified that he is 37 years old, college educated, a member of a church, and is currently employed as production supervisor at Universe Uniforms, a position that he has held since March 2022. He

works from 9 a.m. to 7:30 p.m., receives a salary in excess of $23,000, and receives benefits. He discussed the affidavit attached to his motion for permanent custody and admitted that despite the affidavit's claim that he would leave Mother's home by March 1, 2022, he had not fully moved out of Mother's home by that time. He testified that he remained at Mother's home because he lacked reliable transportation and it was easier to get to his job from Mother's home. He testified that despite his affidavit averring otherwise, he now had every intention of working things out with Mother and eventually marrying Mother. He also clarified that even though they were currently living separately, he intended to move back in with Mother and they are actively looking for housing. He clarified that they have had trouble finding housing for various reasons related to finances and time.

{¶ 24} Upon learning that Father intended to remain with Mother, Father was asked how he would ensure that K.T. was safe if he received legal custody. Father answered that his job provides daycare services and when the child is not in daycare, Mother will be "supervised until I feel it's best fit [sic] that she can like do it on her own, but it will be me as a single dad is how I see myself." (Tr. 155.)

{¶ 25} The GAL testified that all three children should be placed in the permanent custody of the agency. She reminded the court that while Father was living at the home with Mother, all three children received "non accidental injuries caused by Mother." (Tr. 167.) She also reminded the court that Father was "unstable" and indecisive throughout the case. She admitted, however, that K.T., who had been about nine months old when he was removed from Mother and

Father's custody, had not suffered any trauma as a result of Mother's abuse as compared to K.T.'s siblings. This fact did not change the GAL's recommendation.

{¶ 26} In September 2022, the juvenile court issued its decision granting Father's motion for legal custody of K.T. and denying the agency's motion for permanent custody of K.T. Regarding K.T.'s siblings, the juvenile court terminated Mother's parental rights and granted permanent custody of the siblings to the agency. The journal entry relating to Father's legal custody motion pertinently noted that

> [Father] testified to and the worker of record corroborated that [Father] had planned to move to a separate residence to effectuate K.T.'s return. He agreed to not reconcile with Mother and to raise K.T. as his primary caregiver. [Father], however, after moving allowed Mother to move into his new home and indicated that he was going to marry Mother. [Father] made that declaration with the knowledge that K.F. and T.F. were still frightened to be with Mother and their refusal to engage in family counseling if Mother was present. [Father] did not believe Mother posed any future threat to the boys, K.T. included. He testified that he would not have any qualms about leaving the children alone with their Mother.

> In fairness to the parents, K.T. was not subjected to the same psychological or physical harm that his siblings experienced. Moreover, most of K.T.'s negative reactions to visiting his parents can be attributed to him mocking his brothers' behaviors. K.T. is bonded to his [F]ather and [M]other. K.T. has not expressed, partly due to his age, trepidation or resistance to being placed back with his [F]ather.

> THE CCDCFS was required to prove by clear and convincing evidence that it was in K.T.'s best interest to be placed in the Permanent Custody of the CCDCFS. This Court does not find that they met that burden. Actually, the Court found that the [Father] was able to demonstrate by a preponderance of the evidence that it was in K.T.'s best interests to be placed in his legal custody.

Having received the appropriate reports, the Court finds that reasonable efforts have been made to prevent the continued removal of the child from the home. Specifically, the services offered to the parents include: [p]arenting and [m]ental [h]ealth.

The Court further finds that the [F]ather has made significant progress towards alleviating the cause for the removal of the child from the home.

The Court further finds that reasonable efforts have been made to finalize a permanency plan. Specifically, the permanency plan for the child is legal custody to a parent without any restrictions.

The Court further finds that the [F]ather has made significant progress towards alleviating the cause for the removal of the child from the home.

The Court further finds that the child's return to the home is in his best interest, and placement of the child outside the home is no longer appropriate.

{¶ 27} The journal entry denying the agency's motion for permanent custody found that

[t]he Court finds by clear and convincing evidence that pursuant to O.R.C. 2151.414(B)(1):

(d) the child has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period.

The Court further finds that reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification.

[The Court considered, per R.C. 2151.414(D)(1):] (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or

private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

[2151.414(D)(2)](d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal [c]ustody.

[Per R.C. 2151.414(E)(7), the parent has been convicted or pleaded guilty to:] (c) An offense under division (B)(2) of section 2919.22 of the Ohio Revised Code or under an existing or former law of the state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense[.]

{¶ 28} After the juvenile court journalized its decision, the agency filed an "Emergency Motion for Stay of Execution of Order of September 29 Pending Appeal," asking the juvenile court to refrain from placing K.T. in Father's custody while the instant appeal was pending. The juvenile court denied this motion, so the agency filed the same motion in this court. This court granted the motion, and the instant appeal was filed, assigning one error for our review.

The trial court abused its discretion by granting appellee [Father's] motion for legal custody of the child to himself and denying CCDCFS's motion for permanent custody of the child to the agency.

## II. Law and Analysis

{¶ 29} In its sole assignment of error, the agency asserts that the juvenile court erred in granting legal custody of K.T. to Father and erred in denying the agency's motion for permanent custody of K.T.

{¶ 30} We begin by acknowledging that parents have a fundamental right to raise and care for their children. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28; *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 40. However, "'[t]he natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 31} When reviewing a juvenile court's judgment in child custody cases, the appropriate standard of review is whether the juvenile court abused its discretion. *Masters v. Masters*, 69 Ohio St.3d 83, 85, 630 N.E.2d 665 (1994). The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983); *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463. "While a trial court's discretion in a custody modification proceeding is broad, it is not absolute, and is subject to reversal upon a showing of abuse of discretion." *In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, 18 (July 27, 2000), citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). An abuse of discretion occurs when a trial court fails to base its decision on a consideration of the best interests of the child. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 60, citing *In re T.W.*, 8th Dist. Cuyahoga No. 85845, 2005-Ohio-5446, ¶ 27, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991).

**A. Legal Custody to Father**

{¶ 32} Legal custody is governed by R.C. 2151.353(A), which provides that after a child has been adjudicated abused, neglected, or dependent, a juvenile court may

> [a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]

{¶ 33} When a juvenile court considers an award of legal custody following an adjudication of abuse, neglect, or dependency, it must examine "what would be in the best interest of the child based on a preponderance of the evidence." *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 11, 14. A preponderance of the evidence is evidence that is "'more probable, more persuasive, or of greater value.'" *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7, quoting *In re D.P.*, 10th Dist. Franklin No. 05AP-117, 2005-Ohio-5097, ¶ 52.

{¶ 34} R.C. 2151.353(A) does not specify any specific factors or considerations that a juvenile court must consider in determining the best interest of the child. This court has found that juvenile courts may consider the factors enumerated in R.C. 2151.414(D) that govern best interest of the child considerations in permanent custody motion. *In re B.D.*, 8th Dist. Cuyahoga No. 105650, 2017-Ohio-8663, ¶ 26. Since this appeal also asks us to examine the juvenile court's denial of permanent custody to the agency, we address the best interest of the child in reviewing the juvenile court's denial of the agency's motion for permanent custody.

## B. The Agency's Motion for Permanent Custody

{¶ 35} In adjudicating a motion to modify temporary custody to permanent custody, the juvenile court is guided by R.C. 2151.414. R.C. 2151.414 sets forth a two-prong analysis for juvenile courts to apply in determining whether permanent custody should be granted to an agency. First, the court must find, by clear and convincing evidence, any one of the four factors set forth in R.C. 2151.414(B)(1). Second, the court must determine, by clear and convincing evidence, that it is in the best interest of the child to terminate parental rights. R.C. 2151.414(B)(2).

{¶ 36} Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is a higher standard than a preponderance of the evidence. *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994). Because "clear and convincing" is a higher standard than a preponderance, it follows that if the evidence in the record meets the "clear and convincing" standard, it also meets the preponderance of the evidence standard required for Father's legal custody motion. *See, e.g., In re J.G.*, 9th Dist. Wayne No. 14CA0004, 2014-Ohio-2570, ¶ 36 ("In deciding that permanent custody is clearly and convincingly in the best interest of [the child], the juvenile court necessarily determined that it is not in his best interest to be placed in the legal custody of Father.").

{¶ 37} Regarding the first prong, neither party disputes that the juvenile court properly found that R.C. 2151.414(B)(1)(d) was established by the record. The juvenile court properly found that K.T. was in agency custody for "twelve or more months of a consecutive twenty-two month period." The children were in agency custody for over two years at the time of trial.

{¶ 38} At issue in this appeal is the second prong, which requires the juvenile court to find that permanent custody is in the best interest of the child. The agency asserts that the juvenile court did not "correctly [apply] these best interest factors" when it determined that the agency was not entitled to permanent custody of K.T.

{¶ 39} A nonexhaustive list of factors for the juvenile court to consider in determining the best interest of the child are set forth in R.C. 2151.414(D)(1):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 40} In the instant matter, the juvenile court indicated that it considered subsections (a), (c), and (d). The court did not state any specific factual findings relative to each subsection, nor did its analysis specifically examine the best interest of the child beyond stating that it considered it. The court's journal entry also suggests that the trial court considered the fact that Father filed a motion for legal custody and that Mother had been charged with child endangering for her abuse towards K.T. and his siblings.

{¶ 41} After a careful review of the record before us, we find that the trial court's judgment granting legal custody to Father and denying permanent custody to the agency was not in the best interest of K.T. and therefore, was an abuse of discretion.

{¶ 42} We discuss each R.C. 2151.414(D)(1) factor in turn.

{¶ 43} Subsection (a) asks us to consider the interaction and interrelationship of the child with his parents, siblings, and foster caregivers. We first note that Father and K.T. have a good, well-bonded relationship. Father was compliant with visitation, always interacted with all three children, and the children were consistently satisfied with Father. However, in determining permanent custody, while family unity and "blood relationship" are important factors, neither

is controlling, nor is the mere existence of a good relationship. *In re T.W.,* 8th Dist. Cuyahoga Nos. 86084, 86109, and 86110, 2005-Ohio-6633, ¶ 15. The foster mother testified that Father was very consistent with visitation until about March 2022, when he started working at his current job and became unable to visit with the children during the week.

{¶ 44} There was also ample testimony presented indicating that K.T. is extremely well-bonded with his siblings. Numerous individuals, including the foster mother and Palidar, testified that they would be concerned about separating the siblings. Notably, Father himself acknowledged that splitting up the three siblings may not be in their best interest, noting that "I'm still also not willing to break up my three sons. Whether they're with me, that's fine. Whether they're with [the foster family], that's fine, but my whole thing is like they're set." (Tr. 153.) K.T.'s siblings, with whom he is well-bonded, expressed that they do not desire to maintain any relationship with Mother and Mother was never able to repair her trust with them despite efforts to maintain visitation. There was testimony that due to his siblings' distrust and fear of Mother, K.T. also became fearful of visitations. His foster mother noted that K.T. had been "mimicking his brother's behavior through like second-hand trauma behaviors, * * * [s]ometimes he starts to cry and kick and scream and usually if we say [Father's] going, he's fine." (Tr. 23.) This is demonstrative of the strong bond between the siblings and K.T., whom K.T. has been with for the entirety of his life.

{¶ 45} We cannot ignore the role of Mother in this matter. During trial, Father unequivocally maintained that even if given custody of K.T., he intended to remain in a relationship and live with Mother, whose parental rights were terminated as to K.T.'s siblings. It is essential to consider the fact that Mother, in cohabitating with Father, will become a primary caregiver to K.T. She will often be alone with K.T. due to Father's current employment where he works long hours. Further, her involvement in K.T.'s life may distance K.T. from his siblings, who have refused to rebuild their relationship with Mother. Even if K.T. is sent to a daycare as Father testified, it is unrealistic to assume that Mother will not have a large role in his life and upbringing. This is especially concerning because Father was advised by Palidar that the agency was taking the position that "as long as [Father] was with [Mother] due to the conditions, he would be ineligible to get [K.T.]" (Tr. 100.) The affidavit that Father attached to his motion for legal custody expressed his desire to cut ties with Mother, but his actions at trial reflected a different path, which is indicative of Father's failure to demonstrate a commitment to K.T.'s well-being.

{¶ 46} This court has previously found that the individuals who a parent chooses to surround themselves with and reside with are important in determining the best interest of the child. *See, e.g., In re S.P.*, 8th Dist. Cuyahoga No. 111081, 2022-Ohio-2277, ¶ 38 (finding that a parent had not successfully remedied the conditions causing removal of the child when the parent chose to reside with a sex offender who had raped the parent's children); *In re T.J.*, 8th Dist. Cuyahoga No. 111154, 2022-Ohio-1946, ¶ 50 (finding that a parent did not provide a safe and secure

environment for the children because mother maintains contact with sex offenders and perpetrators of domestic violence); *In re E.B.*, 8th Dist. Cuyahoga No. 109477, 2020-Ohio-4307, ¶ 33 (finding that a parent's decision to date a registered sex offender raised concerns about the parent's decision-making processes); *In re Ca.T.*, 8th Dist. Cuyahoga No. 108969, 2020-Ohio-579, ¶ 30 (finding that a parent failed to remedy the conditions causing removal where, even after the parent completed domestic violence classes, the parent remained with the abusive partner who caused removal of the child in the first place); *In re A.G.*, 8th Dist. Cuyahoga No. 105254, 2017-Ohio-6892, ¶ 45 (finding that a parent failed to remedy the conditions causing removal of the children when a parent knowingly engaged in a relationship with a convicted sex offender when the initial removal dealt with a previous partner's domestic violence in the home); *In re M.B.*, 8th Dist. Cuyahoga Nos. 101094, 101095, and 101096, 2014-Ohio-4837, ¶ 32 (finding that a parent's completion of domestic violence services was insufficient where the parent remained with the abuser causing removal). We find that the instant matter presents a similar circumstance; Father chose to maintain a relationship and reside with Mother despite being told it would be adverse to the best interest of K.T.

{¶ 47} Because Mother was also given a case plan and substantially completed it, we acknowledge that there could certainly be some merit to Father's testimony that Mother could be trusted with K.T. However, Father is the only witness that felt this way about Mother. Palidar did not believe that Mother had benefitted from the services that she engaged in and was also concerned that Mother

never received any consequences stemming from the criminal charges related to this matter. The foster mother also stated that she would be concerned with Father receiving custody of K.T. if Mother was still in his life. The GAL also did not believe that Mother had benefitted from the services because she was unable to rebuild her relationship with K.T.'s siblings, despite months of unsupervised visitation. Indeed, the juvenile court did not believe that Mother had benefitted from her case plan in terminating her parental rights as to K.T.'s siblings.

{¶ 48} We finally note that K.T. has an excellent relationship with his foster parents, which will be described in more detail pursuant to subsection (c).

{¶ 49} Subsection (b) asks us to consider the wishes of the child, as expressed through the GAL. "The role of a guardian ad litem in a permanent custody proceeding is to protect the child's interest, to ensure the child's interests are represented throughout the proceedings and to assist the trial court in its determination of what is in the child's best interest." *In re K.Z.*, 8th Dist. Cuyahoga No. 107269, 2019-Ohio-707, ¶ 67. In the instant matter, the GAL testified that permanent custody of all three siblings to the agency is in the children's best interest due to the bond between the siblings as well as the foster family. The GAL particularly noted that even though Mother complied with the case plan, she was unable to rebuild her bond with K.T.'s siblings. She also noted that Father's behavior

was a concern because "of his instability with the family emotionally and the fact that there was domestic violence[2] in the past." (Tr. 168.)

{¶ 50} Subsection (c) asks us to consider the custodial history of the child. Neither party disputes that all three children were in agency custody for over two years and during that time, were almost exclusively in the care of the foster parents. Since K.T. was approximately nine months old he had been in agency custody. At no point did he return to the custody of either Mother or Father during the pendency of these proceedings. The record supports that K.T. and his siblings feel comfortable and supported by their foster parents. The record also contains evidence that K.T.'s removal from Mother and Father may have benefited his development. K.T.'s foster mother testified that when she initially received K.T., he "would kind of sit around a lot of times and stare into space." (Tr. 19.) The foster mother testified that he was referred for therapies to improve his interactions and fine motor skills and that she worked with him every day on these therapies. K.T. scored so well on his follow-up assessment that he did not need further services and has continued to thrive in his foster placement.

{¶ 51} Subsection (d) asks us to consider the child's need for a legally secure placement. We first note the inconsistency of Father's intentions throughout the pendency of the case. In addition to the agency's motion for permanent custody, the

---

2 When questioned by Father's counsel, the GAL admitted that no evidence was presented during the trial pointing to domestic violence concerns between Mother and Father, but she alluded to the fact that she believed it happened, even though there was not any police or court involvement.

trial court also considered Father's motion for legal custody of K.T. Father's motion for legal custody was premised on an affidavit where Father averred that he was separating from Mother, that he would no longer reside with Mother, and that he realized that it was in K.T.'s best interest to be separated from his Mother. At trial, Father reneged on all of these statements that formed the basis for his request of legal custody. Father admitted at the time of trial that he had rekindled his relationship with Mother, that they intended to get married, and that while they were living apart at the time of trial, they were looking for housing together. He no longer felt that Mother was a threat to the children due to her progress, but the evidence adduced at the hearing demonstrates otherwise. Father's sworn testimony differed in the affidavit as well as on the stand during trial.

{¶ 52} We further note that in addition to the conflicting sworn testimony presented by Father, a multitude of evidence received at trial supported the agency's concerns related to Father's indecisiveness and inability to remain faithful to his decisions. Palidar noted that Father and Mother have an incredibly tenuous relationship, stating:

> I'm not sure if it's a pattern, but it seemed to be different almost every month I would see them. They were together. They were not together. They would break up. They would get back together.
>
> [Father] would tell me like at times I'm done with this, I'm moving out, I'm leaving her. And then like the next month he would be back with her and say, oh well, we worked out our problems, we're better now.
>
> And then time would go by, and then they would be back to breaking up. So it was just a back-and-forth for both of them. Breaking up, getting back together, breaking up, getting back together.

(Tr. 99.)

**{¶ 53}** Palidar testified that Father told her "multiple times that he was gonna move out and he was gonna get his own place, and he was gonna get [K.T.] and raise him on his own." (Tr. 100.) Despite these promises, Father acknowledged at the time of trial that he wished to remain with Mother and that he believed that Mother was capable of caring for K.T. Additionally, when questioned regarding his tenuous relationship with Mother, Father responded that "[e]very relationship has conflict." (Tr. 153.)

**{¶ 54}** Father also demonstrated further inability to provide a secure home in March 2022 after starting his new job. The evidence demonstrates that as soon as he began his job, he delayed moving out of Mother's home and he lost contact with the agency. Palidar testified that in the months leading up to trial, Father completely avoided her. Palidar recalled that Father stated, "I don't want you coming to my mother's house, so that's why I'm not returning your calls or responding to your text messages or your letters because I'm avoiding you." (Tr. 101.) Father corroborated this testimony when he took the stand, stating "[w]hen I spoke to [Palidar], I told her like I apologized, I mean, I did admit I was avoiding her call[s]." (Tr. 138.) He also struggled to visit the kids during this time, though we acknowledge that Father did manage to make several weekend visits that accommodated his work schedule.

**{¶ 55}** Finally, the trial court granted legal custody to Father despite the fact that the agency had not seen the housing where Father currently resides and despite the fact that the agency would be unable to view the home that Father and Mother eventually secured. This is concerning because when Mother and Father were living together, the agency had multiple concerns about the safety of the home, noting excessive clutter and Mother and Father's failure keep the home in good repair. The agency never recorded any improvement in these areas.

**{¶ 56}** Subsection (e) asks us to consider whether any of the R.C. 2151.414(E)(7) to (11) factors apply. The trial court found that R.C. 2151.414(E)(7)(c) applied because Mother was convicted of an offense under R.C. 2919.22(B)(2) (child endangering) pertaining to the children while residing in the same household as Father. This finding is well-established by the record before us and because Father expressed that he continues to reside with Mother despite her criminal convictions relating to the children, this factor weighs against K.T.'s best interest.

**{¶ 57}** We recognize that both Father and Mother made substantial strides in the completion of their case plans. We nonetheless note that Palidar and the GAL were unpersuaded that either of them benefitted from the case plans. Further, this court has found that "successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency." *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.), citing *In re J.L.*, 8th Dist. Cuyahoga No. 84368, 2004-Ohio-6024, ¶ 20. We further note that while K.T. may have a good relationship with Father, this court has recognized that the

best interest of the child requires permanency and a safe, secure environment, regardless of the strength of the child's relationship with the biological parent. *In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-349, ¶ 23.

{¶ 58} In its journal entries granting legal custody to Father and denying the agency's motion for permanent custody, the juvenile court acknowledged that

> the CCDCFS also found that [Father's] belief that the children are emotionally healed notwithstanding their claims that they still fear their mother as a huge impediment to reunification. K.F. and T.F may appear, to [Father], to be emotionally healed because they acquiesce to the visits with Mother but their comments and behaviors about not wanting to be left alone with Mother is a clear demonstration that they have not healed from their past trauma. [Father's] inability to see that has the potential of placing K.F. and T.F. in jeopardy of future emotional and possible physical harm. *The last concern is impactful because the CCDCFS expressed to [Father] the need to separate himself from Mother to increase the likelihood that they would recommend, at a minimum, K.T. be reunited with his father.*

(Emphasis added.)

{¶ 59} The trial court acknowledged that Father minimized the trauma to K.T.'s siblings and acknowledged that Father was aware of the agency's expectations for him to achieve permanent custody. Nonetheless, the trial court still found that the agency did not meet its burden in establishing, by clear and convincing evidence, that permanent custody to the agency was in the best interest of the child and instead found that Father established, by a preponderance of the evidence, that legal custody was in K.T.'s best interest. We cannot agree. The record demonstrates that in resolving evidentiary conflicts and making credibility determinations, the trial court

lost its way and focused its custody determination on the interests of Father rather than the best interest of K.T. The state's sole assignment of error is sustained.

### III. Conclusion

{¶ 60} After a thorough review of the record and law, we find that the trial court erred in granting legal custody of K.T. to Father and erred in denying CCDCFS's motion for permanent custody as to K.T. We reverse the juvenile court's decision to grant permanent custody to Father and remand with instructions to terminate Father's parental rights and grant permanent custody of K.T. to the agency.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

MARY EILEEN KILBANE, J., CONCURS;
MICHELLE J. SHEEHAN, J., CONCURS IN JUDGMENT ONLY