[Cite as *In re R.R.*, 2023-Ohio-2067.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE R.R., ET AL. | : | |
| | : | No. 112135 |
| Minor Children | : | |
| | : | |
| [Appeal by A.R., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 22, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-18-908319, AD-18-908320, AD-18-908321,
AD-18-908322, AD-18-908323

*Appearances:*

Brian A. Smith Law Firm, LLC and Brian A. Smith, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary J. LaFleur and Anthony R. Beery, Assistant Prosecuting Attorneys, *for appellee* Cuyahoga County Division of Children and Family Services.

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Appellant-mother A.R. ("Mother") appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") that (1) granted legal custody of her minor children R.R., Dem.C., Z.C. and

J.C. to various other relatives and (2) granted permanent custody of her minor daughter L.R. to appellee, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

**Factual Background and Procedural History**

{¶ 2} This appeal involves Mother's five minor children — R.R. (d.o.b. September 18, 2007), L.R. (d.o.b. February 18, 2013), Dem.C. (d.o.b. September 21, 2014), Z.C. (d.o.b. May 26, 2016) and J.C. (d.o.b. June 27, 2018).

{¶ 3} On July 2, 2018, CCDCFS filed a complaint for neglect and temporary custody and a motion for predispositional temporary custody of the children. The complaint alleged that Mother had a substance abuse problem (i.e., marijuana, cocaine and alcohol) that prevented her from providing appropriate care for the children, that Mother had tested positive for cocaine while pregnant with J.C. and that, although Mother had completed treatment in the past, she had failed to maintain her sobriety. The complaint further alleged that Mother lacked the necessary judgment and parenting skills to provide a stable home for the children, that Mother had been previously convicted of driving under the influence and had violated probation after testing positive for cocaine and that Mother had "engaged in domestic violence" with the children's fathers or alleged fathers. With respect to Des.C. (father of Z.C. and Dem.C. and alleged father of J.C.), the complaint alleged that he had been convicted of attempted drug possession and attempted possession of criminal tools, that he had failed to establish paternity and that he had minimal involvement with the children. With respect to E.W. (alleged father of R.R.), the

complaint alleged that he had failed to establish paternity and had failed to support, visit or communicate with R.R. With respect to R.S. (father of L.R.), the complaint alleged that he had failed to support, visit or communicate with L.R.[1] On July 27, 2018, the juvenile court granted the agency's motion for predispositional temporary custody and committed the children to the predispositional temporary custody of CCDCFS.

{¶ 4} The agency filed a case plan that required Mother to complete a domestic violence program, to complete substance abuse treatment and aftercare and to submit to random drug screens. The juvenile court approved the case plan.

{¶ 5} In September 2018, the agency amended the dispositional prayer of the complaint from a request for temporary custody to a request for protective supervision. On September 13, 2018, the magistrate conducted an adjudicatory hearing. Mother stipulated to the allegations of an amended complaint,[2] and the

---

[1] The children's fathers are not parties to this appeal. Accordingly, we do not specifically address the allegations relating to the fathers here.

[2] As it relates to Mother, the amended complaint for neglect and protective supervision alleged:

1.  Mother has a substance use disorder. Mother needs to continue to engage in substance use disorder treatment and maintain her sobriety to ensure the safety of the children.
2.  Mother was convicted of driving under the influence. See [C]ase No. 2017 TRC 014855.
3.  Mother should engage in domestic violence and parenting classes in order to improve her parenting skills and ability to protect the children.

  * * *

children were adjudicated neglected. In October 2018, the juvenile court terminated the predispositional temporary custody order and returned the children to the legal custody of Mother with protective supervision by the agency. The juvenile court ordered that a CCDCFS social worker visit the home once a week, unannounced, and that the court be notified immediately if Mother had a positive drug test or failed to comply with case plan services.

{¶ 6} On February 13, 2019, the agency filed a motion to terminate protective supervision. The agency indicated that Mother had completed substance abuse treatment, had maintained her sobriety, had completed a domestic violence education program and had been providing appropriate care for the children. On March 8, 2019, the agency notified the juvenile court that Mother had tested positive for illegal substances. At a dispositional review hearing on June 17, 2019, the agency made an oral motion to amend its previously filed motion, to seek a first extension of protective supervision rather than to terminate protective supervision. Mother stipulated to, and the juvenile court granted, the extension of protective supervision. The juvenile court ordered that the CCDCFS social worker continue to make weekly visits to Mother's home and that the court be notified within 24 hours if Mother had a positive drug test.

{¶ 7} In December 2019, the agency filed a motion for a second extension of protective supervision. The agency asserted that Mother had completed case plan

Reasonable efforts were made by Cuyahoga County Division of Children and Family Services to prevent removal of the child[ren] from the home and removal is in the best interest of the child[ren].

services for domestic violence and had been providing negative random urine screens but that Mother needed to complete substance abuse treatment and continue to provide negative urine screens. At the January 2020 dispositional review hearing, the CCDCFS sobriety treatment and recovery team ("START") worker assigned to Mother's case, Catrina Moore, testified that although the agency had not notified the court as previously ordered, the Women's Recovery Center, where Mother was then receiving substance abuse services, reported that Mother had tested positive for drug use in August and November 2019. Mother stipulated to, and the juvenile court granted, a second extension of protective supervision. The juvenile court ordered that the social worker continue to make weekly unannounced visits to Mother's home, that Mother submit to monthly follicle drug screens and that the court be notified within 24 hours if Mother had a positive drug test.

{¶ 8} On January 13, 2020, the agency filed an amended case plan, adding mental health services to the case plan to address Mother's diagnosis of posttraumatic stress disorder ("PTSD") and depression and R.R.'s diagnosis of oppositional defiant disorder, attention-deficit/hyperactivity disorder ("ADHD") and bipolar disorder. The amended case plan required that Mother undergo a psychological evaluation, comply with any treatment recommendations and work on developing parenting skills to help R.R. function better. The juvenile court approved the amended case plan.

{¶ 9} On March 27, 2020, the agency filed a notice that Mother had tested positive for cocaine in urine screens conducted on March 3, 10, 13 and 17, 2020.

{¶ 10} On May 13, 2020, the children were removed from Mother's care and taken into emergency custody pursuant to an ex parte telephonic order. The following day, the agency filed a motion for immediate custody to CCDCFS and a motion to modify protective supervision to temporary custody to CCDCFS. The agency alleged that Mother continued to actively abuse cocaine, amphetamines and marijuana while serving as the sole caregiver of the children, that R.R. had special needs that were not being adequately addressed by Mother, placing the younger children at risk of harm, that L.R. and Z.C. had head lice that was not being addressed and that Mother was overwhelmed by the care for her children and unable to provide adequate care for them. Mother stipulated to a finding of probable cause for the removal of the children. The juvenile court granted the motion for immediate custody and the children were, once again, placed in the emergency temporary custody of the agency.

{¶ 11} On August 13, 2020, the magistrate held a hearing on the agency's motion to modify protective supervision to temporary custody. Mother stipulated to the motion. The juvenile court terminated its emergency custody order and committed children to the temporary custody of the agency. In March 2021, Mother stipulated to a first extension of temporary custody.

{¶ 12} In the months that followed, the agency filed a number of different motions with a number of different permanency options before settling on the following requests:

- As to L.R., a motion to modify temporary custody to permanent custody to CCDCFS,

- As to R.R., a motion to modify temporary custody to legal custody to his maternal grandmother, G.R., and

- As to Dem.C., Z.C. and J.C. a motion to modify temporary custody to legal custody to their maternal aunt, F.S.

{¶ 13} In its motion for permanent custody, the agency argued that it should be granted permanent custody of L.R. pursuant to R.C. 2151.414(B)(1)(d) and the best interest of the child because (1) L.R. had been in continuous agency custody since May 2020, (2) Mother had failed to maintain her sobriety, (3) L.R.'s father lacked housing and was unable to provide for her basic needs and (4) no other relatives had been identified who were willing and able to provide appropriate care for L.R.

{¶ 14} In its motions for legal custody, the agency asserted that being placed in the legal custody of G.R. would be in the best interest of R.R. and that being placed in the legal custody of F.S. would be in the best interest of Dem.C., Z.C. and J.C. because (1) Mother had failed to maintain long-term sobriety, needed to demonstrate stability with mental health services and remained unable to provide a safe and permanent home for the children and (2) the children's fathers or alleged fathers had failed to establish paternity or were unwilling to cooperate with the agency and complete services. Each of the proposed legal custodians submitted a signed statement of understanding in accordance with R.C. 2151.353(A) and 2151.42, indicating that she was ready, willing and able to assume legal responsibility for the child or children for which the agency sought legal custody.

{¶ 15} On March 25, 2022, Mother filed a motion for legal custody as to all five children. Mother asserted that she should be granted legal custody of the children because (1) she had completed all aspects of her case plan, including inpatient drug treatment, outpatient drug treatment, aftercare and mental health services through Community Assessment & Treatment Services ("CATS") and the Greater Cleveland Drug Court program, (2) she had submitted to random drug screens and had been sober for more than six months, (3) she had voluntarily re-engaged with mental health services through Brighter Tomorrow Community Services ("Brighter Tomorrow"), (4) she had regular visitation with her children and (5) she had stable and appropriate housing, was employed and was able to meet her children's basic needs. Mother argued that she could provide a safe and stable home for the children and that it was in their best interest for the court to terminate temporary custody and grant legal custody of the children to her.

{¶ 16} On June 13, 2022, the juvenile court conducted in camera interviews of the four oldest children.[3] In September 2022, the parties submitted agreed journal entries, consenting to the continued extension of temporary custody of the

---

[3] The record indicates that the magistrate also conducted in camera interviews of L.R., Dem.C. and Z.C. on November 16, 2021. There is no transcript from these in camera interviews in the record. However, because it appears that the juvenile court judge relied on his own in camera interviews of the children conducted on June 14, 2022 (rather than those conducted by the magistrate seven months earlier) in reaching his decision — the transcript of which is in the record — the absence of the transcript of the November 16, 2021 in camera interviews does not meaningfully impact our review here.

children.  On October 18, 2022, the case proceeded to a hearing on the pending motions.

**Hearing on Motions for Permanent Custody and Legal Custody**

**{¶ 17}** Three witnesses testified on behalf of the agency at the hearing: Dianna Banzhaf, an early childhood mental health specialist and licensed social worker at Ohio Guidestone, Sharon Mason, a qualified mental health specialist at Ohio Mentor Network, and Andrea Flynn, an ongoing case worker in CCDCFS' START department.  One witness, Lillian Brown, a clinical mental health therapist at Brighter Tomorrow, testified on behalf of Mother at the hearing.[4]  At the time of the hearing R.R. was 15, L.R. was 9, Dem.C. was 8, Z.C. was 6 and J.C. was 4.

**Testimony of CCDCFS' Witnesses**

**{¶ 18}** Banzhaf testified that she has been Z.C. and J.C.'s therapist since February 2021.  She said that, prior to beginning therapy, she had assessed the children and diagnosed Z.C. with "other specified trauma and stressor related disorder" and J.C. with PTSD.  Banzhaf stated that she meets with the children once

---

[4] In addition to the witness testimony, the agency introduced copies of various motions and orders entered in the five cases, certified medical records for each of the children, certified Ohio Guidestone treatment records for Dem.C. and J.C., certified Applewood treatment records for R.R. and certified Positive Education Program treatment records for R.R.  Mother introduced copies of documents from United States Drug Testing Laboratories, Inc. relating to the results of Mother's April 2022 toenail drug screen and certificates of completion for Mother's completion of a domestic violence education program in November 2018, parenting classes in May 2021, an anger management program in June 2021, intensive and nonintensive outpatient treatment in December 2021, a drug and alcohol rehabilitation program in July 2021 and the Greater Cleveland Drug Court program in February 2022. No objections were raised to the admissibility of the exhibits, and the juvenile court admitted all of the proffered exhibits.

or twice a week for approximately 45 minutes to an hour to address issues associated with "past neglect and abuse." She indicated that she utilizes "play therapy" with the children to build trust and connection, to allow them to "act out past trauma and abuse" and to "help them work on their feelings about it."

{¶ 19} Banzhaf testified that Z.C. had disclosed "some neglect and abuse that ha[d] happened to her, physical abuse" while in Mother's care. She stated that Z.C. "worries" that "she'll go back to mom" or otherwise be taken away from her aunt and has "nightmares * * * of being hit by mom and a boyfriend."

{¶ 20} Banzhaf testified that Z.C.'s "past trauma" included "being locked in her room for extensive periods of time," i.e., "full days," "on a consistent basis," leading to continuing worries regarding food insecurity even though "she currently has more than enough food and it's available to her and accessible at any time." Banzhaf stated that, when Z.C. was living with Mother, Z.C. had "no recollection of having full meals at all."

{¶ 21} Banzhaf testified that Z.C. "talked about getting hit by mom and having bruises on her body" and told Banzhaf that she had been "punched in the face and also hit with a belt; specifically, the buckle of a belt on a number of occasions." Banzhaf described one incident Z.C. reported in which Z.C. and her siblings had been locked in a room. Because they had been unable to access the bathroom, they went to the bathroom in plastic bags and then threw the bags out the window. Z.C. told Banzhaf that when Mother discovered what they had done, Mother "beat [Z.C.] with a belt" and Mother's boyfriend "punched her in her face."

{¶ 22} Banzhaf testified that Z.C. also described being kept in a high chair for lengthy periods of time, unable to play with her siblings. She stated that Z.C. did not understand why she had been kept in the high chair, i.e., she did not believe it was for disciplinary reasons. According to Banzhaf, Z.C. said that she would nap in her high chair and would see her siblings "walking around and playing * * * and she wouldn't be with them."

{¶ 23} With respect to supervision and caregiving, Banzhaf testified that L.R. and, to a lesser extent, R.R., were the only caregivers Z.C. and J.C. identified. When asked, "[W]hat about mom? What kinds of things does mom do for you and how has mom taken care of you," Z.C. replied, "[N]o, not mom, [L.R.]. Just [L.R.]."

{¶ 24} Banzhaf testified that J.C. has had difficulty with behavior regulation and has exhibited regressive behaviors, e.g., difficulty being toilet trained, difficulty sleeping in her room and crying a lot. Banzhaf stated that J.C. told her that Mother had hit her but had not related any memories of being locked in a room or more detailed descriptions of physical abuse to Banzhaf. Banzhaf explained, it's "a little bit common for that age to not have specific stories told verbally."

{¶ 25} Banzhaf testified that she did not have any concerns regarding the veracity of the children's statements or whether they may have been "coached" to provide "canned answers * * * about their prior experiences" because the children's stories would "just come up naturally," e.g., during play, were expressed "in child language" (not "adult words") and, when retold, were consistent, "repeat[ed] * * * the same way."

{¶ 26} Banzhaf testified that Z.C. told her how much she likes living with her aunt, F.S., and that she "seems to have grown a very trusting connection and bond with her aunt." She stated that J.C. had likewise indicated to her that she is happy living with F.S. and being with her siblings. Banzhaf indicated that she has no concerns regarding the children's safety living with F.S.

{¶ 27} With respect to visitation with Mother, Banzhaf testified that Z.C. and J.C. are often "a bit withdrawn," "more quiet" and "don't interact as much" following visits with Mother. She stated that the children will also engage in "bad behavior," such as marking on the walls, or exhibit "pent up aggression," arguing with one another or getting physical and hurting each other, following visits. Banzhaf stated that Z.C. "express[es] a lot of worries" about visiting with Mother and that the visits "trigger[] her from her past trauma," i.e., "she will zone out and disassociate and will just stare into space, and then she will not verbalize anything and will just stay in one spot and hold her body really close and just not interact and completely withdraw." She indicated that J.C. "switch[es] back and forth" regarding whether she is happy to see Mother and will often say "how angry she is at mom," particularly because of the way Mother has treated R.R.

{¶ 28} With respect to their interactions with Mother at visits, Banzhaf testified that the girls had said that Mother had told them to "ruin their toys" or damage other things at their aunt's home so they could go into foster care. She stated that Mother had purchased toys for the children and then told them that they could only keep the toys if they stayed with her. Banzhaf also described an incident

(related to her by the children) in which, after the children were given new shoes by their aunt, Mother stepped on their shoes and untied them.

{¶ 29} Banzhaf testified that the children were currently working on mindfulness, calming techniques for anxiety and ways to reframe their current negative past experiences in therapy. She stated that she believed the children needed a caregiver who understood and acknowledged the trauma they had experienced and their need for continuing therapy to process that trauma.

{¶ 30} Banzhaf testified that, when she receives a referral, she primarily gets information about her clients from the CCDCFS case worker and their current caregiver. She stated that she had never observed any visits between Mother and the children and that she had never spoken with Mother.

{¶ 31} Mason testified that she has been L.R.'s therapist since March or April 2022. She stated that L.R. had been diagnosed with PTSD and ADHD and, at the time, was "basically very hyper" and needed someone to help her with coping skills to deal with the trauma she was experiencing. She indicated that she sees L.R. two to three times a week for a total of approximately six hours each week.

{¶ 32} Mason testified that L.R. told her that she "never wants to go back home again" because of "[w]hat [Mother] did to us." Mason explained that L.R. told her that Mother had "locked" L.R. and her siblings in a room "for hours at a time, a long, long time" while Mother was in another room with someone else. She stated that L.R. told that she was "very hungry," that she could not go to the refrigerator to

get food and that she "would get in trouble" if she left the room, i.e., she would "get a whooping."

{¶ 33} Mason testified that L.R. told her that, while in Mother's care, she had been "whooped" with a belt. She stated that L.R. told her that her other siblings had received "worse punishment" from Mother, including "whoopings" or being kept in a high chair all day.

{¶ 34} Mason testified that L.R. exhibited various trauma symptoms such as "go[ing] off into a stare" in the middle of a conversation, "thinking about something that had happened in the past," "jumping" at loud noises and acting "very fidgety."

{¶ 35} Mason stated that L.R. has had regular, weekly visits with Mother. Mason testified that she does not specifically ask L.R. about these visits, i.e., she only asks "how [L.R.] is doing," and that "basically she doesn't talk a lot about it." Mason suggested that this could be due to the timing of the visits and when Mason sees L.R., i.e., "that's over with and I guess she's gone on," she's "trying to be a kid and have fun." Mason indicated that L.R. loves her siblings and that, although she used to talk a lot about her siblings, she "hasn't been talking about them as much" because she does not see them as frequently as she once did.

{¶ 36} Mason indicated that L.R. is currently in a foster placement and told Mason that she wants to remain there. Mason stated that she has no concerns about L.R.'s safety or her basic needs being met in the foster placement. Mason testified that she had never met Banzhaf, had never received any notes from Banzhaf and had never spoken with any of L.R.'s siblings. She stated that she speaks with the

CCDCFS case worker, Flynn, "when[ever] we need to talk" and that this has occurred approximately four or five times since she started working with L.R.

{¶ 37} When asked whether L.R. had ever lied to her or told her "made up" stories, Mason testified that she has questioned L.R. "over and over sometimes" and that, "for the most part," L.R. "tells the truth." Mason stated that L.R. had been "consistent" in her descriptions of the trauma she has experienced. Mason stated that she has never perceived L.R. as having been "coached" or as having provided "canned answers" in discussing her prior traumatic experiences.

{¶ 38} Mason stated that she was working with L.R. to develop coping skills to deal with her trauma and associated anger and believed that L.R. needed a caregiver who understood and acknowledged the trauma she had experienced and her need for "a lot" of ongoing counseling.

{¶ 39} Mason testified that, before being placed in her current foster home, L.R. had spent one year living with her father, R.S. Mason indicated that during the time L.R. was in his care, there were allegations of sexual abuse of L.R. by R.S. She stated that issues associated with that alleged abuse were among the issues she had been working on in her treatment of L.R. Mason stated that although she and L.R. had previously discussed what happened with her father, L.R. was not talking about it "anymore," likely because "it makes her feel uncomfortable."

{¶ 40} Flynn, the current CCDCFS case worker assigned to the case, testified that the children had been involved with the agency since August 2018 and that she was assigned to the case in August 2020.

{¶ 41} Flynn testified that, in 2018, the agency received a referral after Mother tested positive for cocaine during her pregnancy with J.C. She stated that the children were adjudicated neglected in October 2018 and remained in Mother's legal custody with protective supervision until May 2020. Flynn explained that, on May 14, 2020, the agency filed a motion for immediate custody and a motion to modify protective supervision to temporary custody because Mother had relapsed and, when the children were taken to the hospital, it was discovered that they had been beaten. Flynn stated that both motions were granted; the children were placed in the emergency custody of the agency on May 14, 2020, and the agency was granted temporary custody of the children in September 2020. She indicated that the children had remained in the temporary custody of the agency since that time.

{¶ 42} Flynn then discussed the case plan for the family. With respect to the children's fathers, Flynn testified that R.R.'s alleged father was E.W. but paternity had never been established. She indicated that the agency had made efforts to contact E.W. but that he did not respond and that the agency was unaware of any existing relationship between E.W. and R.R.

{¶ 43} Paternity was established for the remaining children. Flynn testified that R.S. was the father of L.R. and that Des.C. was the father of Dem.C., Z.C. and J.C. She stated that no services were listed on the case plan for Des.C. because he told Flynn he was "not willing to work case plan services." She stated that Des.C. informed Flynn that he "preferred for the children to stay where they were" and had "not looked for reunification" with his children.

**{¶ 44}** Flynn testified that R.S. had served as L.R.'s caregiver from October 2000 until December 2021 — when he lost his housing. She stated that, as of the week prior to the hearing, R.S. still had not obtained housing and, therefore, the agency could not recommend reunification with him because he was "not stable."

**{¶ 45}** Flynn acknowledged that L.R.'s counselor had notified her of allegations that had been made against R.S. regarding his alleged inappropriate touching of L.R. She stated that the agency's sex abuse unit investigated the allegations and determined that they were unsubstantiated due to a lack of evidence. She explained that "[t]hat doesn't mean that something didn't happen," just that "the investigation wasn't enough to prove the allegation." She noted that L.R. was young, and "she didn't say physical things that would prove the allegations, so it wasn't enough to substantiate," but that "a criminal referral was made" in the matter. Flynn was not aware of the results of the criminal referral.

**{¶ 46}** Flynn testified that case plan services for Mother included referrals for substance abuse, mental health, domestic violence and parenting services. With respect to Mother's engagement with substance abuse services, Flynn stated that, in August 2020, Mother was engaged in a program through the Women's Recovery Center to address her cocaine and alcohol use. She indicated that Mother was unsuccessfully discharged from that program and referred to Sandusky Treatment Center for a higher level of care. Flynn stated that Mother successfully completed that program in December 2020 but, shortly after discharge, again tested positive for cocaine.

{¶ 47} Flynn testified that Mother's probation officer referred her to a higher level of care, i.e., to Jordan Home, a sober living home, and to Moore Counseling for intensive outpatient treatment. Flynn stated that Mother was discharged from both programs because "[s]he was not following the rules" and was referred to CATS, another substance abuse treatment provider, in April 2021. Flynn testified that Mother successfully completed all CATS services in December 2021 and then needed to live a "sober lifestyle" that was "consistent with the recovery program."

{¶ 48} To determine whether Mother was maintaining her sobriety, the agency asked Mother to submit to random drugs screens. Flynn stated that, because Mother had cancer, the agency could not obtain a hair sample from Mother and, therefore, requested that she submit to a nail screen. Flynn testified that a toenail screen conducted in April 2022 was positive for methamphetamines, which Mother claimed was due to her cancer treatment medication. Flynn stated that the agency requested, but was unable to obtain, a subsequent nail screen because Mother had placed acrylic on all her fingernails and toenails.

{¶ 49} Flynn testified that, during this time, Mother also submitted to random weekly urine screens, one of which tested positive for alcohol. Flynn stated that Mother, once again, indicated that the positive screen was due to her cancer treatment medication. Flynn indicated that although Mother had not been referred for any further substance abuse treatment, substance use "remain[ed] open" for Mother on the case plan to monitor Mother's sobriety.

**{¶ 50}** With respect to parenting, Flynn testified that Mother had successfully completed parenting classes in 2018, but that the agency continued to monitor Mother's progress with parenting during visits to determine the extent to which she had benefited from those services. Flynn stated that she did not believe Mother had fully benefited from the parenting classes because Mother engaged in actions such as having conversations that were not age appropriate with her children (e.g., sharing her cancer diagnosis with her oldest child, which caused him to begin bedwetting, acting out and locking himself in his room), stepping on the shoes the children had been given by their aunt and taking aways toys she had given to the children during visits.

**{¶ 51}** With respect to the mental health and domestic violence services on the case plan, Flynn stated that Mother had told the agency that she had PTSD due to a series of incidents in which she was a victim of domestic violence. Flynn stated that Mother successfully completed a domestic violence program in 2018 and that Mother had previously engaged in mental health services through Moore Counseling and remained actively engaged in counseling at Brighter Tomorrow.

**{¶ 52}** Flynn testified that, although Mother had completed all case plan services, the agency could not recommend reunification of Mother and the children because "[t]he kids throughout their counseling have had concerns with being returned to [Mother] due to the trauma they received while they were in her care."

**{¶ 53}** Flynn identified certified copies of medical records the agency had obtained for each of the children, which documented physical abuse while in

Mother's care.  She read excerpts from those medical records into the record, including the following:

In medical records relating to R.R.,

- Progress notes dated May 13, 2020, stating, in part: "During triage, [R.R.'s] sister reports mom hits the siblings with a belt. Reports this has been ongoing and involves all children.  [R.R.] denies, does not offer information.  He has multiple unexplained scars, including J-shape[d] scars concerning [sic] for being hit with a cord."

- Notes from February 11, 2022 regarding patient history, stating, in part: "4/4/14 brought to ED by 2 DCFS caseworkers & [patient's] mother[.]  'A call was made to the Children Services Hotline today stating that patient had marks on his face and neck.'  Found to have excoriated areas on his neck and marks on his left cheek. * * * Due to physician concerns of abuse, [patient] was sent to CT scan where a head CT and skeletal scan was done. Head CT was clear.  [Patient] admitted for observation. There is already an open case with DCFS. He has witnessed domestic violence against his mother and two of her partners, one his biological father.  He has been diagnosed with ADHD and the mother describes a wide array of deeply troubling behaviors (including fire-setting, aggressiveness toward other children, and cruelty towards small pets)."

- Progress notes dated May 6, 2022, stating, in part, under the heading "trauma/loss/stressors": "11 referrals to CCDCFS for [sic] kindergarten — abuse or neglect, poor hygiene, not being fed (mom PTSD and cocaine use). * * * Witnessed interpersonal violence with every one of mom's partners. * * * He jumped out of a second floor window because he feared one of mom's boyfriend[s] — bruised, went to aunt's home.  She called the police. * * * 5/2019 — when removed from the home, he had many bruises of various ages.  (siblings were abused also)"

In medical records relating to L.R.,

- Progress notes dated May 13, 2020, stating, in part: "During triage [LR.] reports mom hits the siblings with a belt.  Reports this has been ongoing and involves all children.  [L.R.] did not present with any injuries noted today."

- Notes dated May 28, 2020, stating, under the heading "[c]aregiver narrative": "[L.R.] has been very talkative about the abuse her younger siblings have sustained at the hands of the adult relatives.[5] She has also stated that this has not happened to her. She is very often quiet and to herself while in her current placement."

In medical records relating to Dem.C.,

- Notes dated May 28, 2020, under the headings "[c]aregiver narrative" and "significant concerns," stating, in part: "[Dem.C.] has had some difficulty adjust[ing]. He came with multiple scars, disclosing he had been hit with the belt by his relatives, aunties. He and his older brother were also witness to adult sexual acts in their household." * * * [S]cars, the most of any of the children, emotional regulation/sexualized behaviors."[6]

In medical records relating to J.C.,

- Progress notes dated May 13, 2020, stating, in part: "No rash, bruises or signs of acute injury. No open sores. No evidence of scabies, ringworm, bed bug bites, or lice. Superficial scratches noted to chest. Right shin with linear scar. Bilateral posterior thighs with raised purple/red welts, warm to the touch, child flinches when touched. * * * During triage [J.C.'s] sister reports mom hits the siblings with a belt. Reports this has been ongoing and involves all children. [J.C.] present with welts to bilateral posterior thighs, sister reports mom hit her with a belt, as recent as last night."

- Progress notes dated May 15, 2020, stating, in part: "[Foster mother] reports that she has a lot of scars and very dry skin. * * * [Foster mother] also reports that older sister [L.R.] said mom was whipping her."

---

[5] Flynn testified that, at that time, the "adult relatives" who had access to the children were Mother and Mother's boyfriend.

[6] With respect to the identity of these "aunties," Flynn testified that Dem.C. indicated that they were "[h]is mom's friends." Flynn stated that G.R. and F.S. did not have access to the children during the time of the alleged abuse because they were "feuding" with Mother.

- Progress notes dated May 28, 2020, stating, in part, under the heading "[c]aregiver narrative": "[J.C.]'s skin has much improved since coming into their care. * * * [T]he redness and swelling at the thighs has resolved. Just a few dark marks are still there. [Caregiver] also had concern about the dark marks on [J.C.'s] back."

In medical records relating to Z.C.,

- Progress notes dated May 13, 2020, stating, in part: "[L]ice. DCFS caseworker Catrina Moore reports that child had scratches to her upper left chest a few days ago. Child reported today during examination that mom hit her with a belt."

{¶ 54} Flynn also testified regarding various "scars" and "markings" on the children that were documented in the medical records, some of which were still visible on R.R. as of the time of the hearing. Flynn testified that, when asked about the injuries reflected in the medical records, Mother claimed they were "self-inflicted" and that "she never harmed" her children. Although Mother had told Flynn that she "whoops" the children "properly," Mother denied hitting any of the children with a belt or other "foreign object" and denied any other physical abuse of the children. Mother also denied the children's claims of being locked in a room for extended periods of time, lacking access to food and having to throw their excrement out of the window. According to Flynn, Mother stated that she "did not have locks or doors" and "always fed her children" and claimed that her children's stories were the result of the children "being manipulated by their caregivers."

{¶ 55} Flynn testified that she raised the issue of engaging in family counseling related to the abuse the children had disclosed during a call with Mother, Mother's counselor, the family advocate and a social worker from the Public

Defender's Office a week before the hearing. She explained that family counseling had not previously been part of the case plan because Mother had never acknowledged that any physical abuse had occurred and she did not know "how to help the mom if she continues to say that this never happened." Flynn indicated that, during the call, Mother was "very defensive" and distinguished between "a whooping" and "a beating." Mother stated that she had never "beat" her children, she had "only whooped them" and that the children "might not understand that they were whooped, not beat." Flynn stated that she tried to ask Mother to explain the difference between the two but that Mother "kept over-talking" her so "she "wasn't able to get much through." Flynn testified that Mother later indicated that she would be willing to participate in family counseling and the agency amended the case plan to include family counseling but it had not yet commenced as of the time of the hearing.

{¶ 56} With respect to visitation, Flynn testified that the children had weekly two-hour visits with Mother, and that Mother appeared for every visit. Flynn stated that until December 2021, visits were usually at the library. To make it easier for Mother, while she was undergoing chemotherapy, supervised visits then occurred in Mother's home, until April 2022, when one of the children reported seeing beer cans and a white substance in Mother's bedroom. Mother was then sent for a urine screen and visits returned to the library. Flynn stated that the result of that drug screen was negative.

**{¶ 57}** Flynn testified that, when they arrived for visits, Mother typically sat in the car and listened to music and the children got in the back of the car, climbed in the trunk or ran around the car. They then went into the library, had lunch in the cafeteria and then went to a play area, computer area or reading area. Flynn testified that Mother engaged most with R.R. and L.R. during visits and had "some engagement" with the younger children. She stated that it was "a common occurrence" for there to be periods of time in which Mother was not engaged with any of the children during visits.

**{¶ 58}** Regarding the children's placements, Flynn testified that R.R. had been placed with his grandmother, G.R. She stated that G.R. was currently residing with her mother, S.S., while an issue related to G.R.'s CMHA housing was resolved. She indicated that there were no concerns for R.R.'s safety while in G.R.'s care and that S.S.'s home had been previously investigated and deemed safe. She indicated that R.R. had, at times, wavered a bit as to whether he wanted to live with Mother or G.R. but that he had most recently advised Flynn that he wanted to remain with G.R.

**{¶ 59}** Flynn testified that L.R. was in a foster placement as of the time of the hearing and that there were no safety concerns for L.R. at that placement. She stated that if the agency were granted permanent custody of L.R., she would remain in the placement "while adoption service is undergoing."

**{¶ 60}** Flynn testified that the three youngest children, Dem.C., Z.C. and J.C. were living with their maternal aunt, F.S. Flynn stated that while the children were

living with F.S., a referral was called in, alleging that F.S. had spanked Dem.C. outside his school. An investigation was conducted and F.S. confirmed that she had spanked Dem.C. with her hand three times on his buttocks. Flynn stated that the agency explained to F.S. that it does not allow corporal punishment and that Dem.C. should not be spanked due to his prior trauma. Flynn said that she had had a similar conversation with Banzhaf and the children's maternal great-grandmother, S.S., about not hitting J.C. with a ruler. Flynn indicated that F.S.'s spanking of Dem.C. was "controlled," left no bruises and was "not considered abuse." Flynn stated that, following that incident, there had been no further concerns regarding F.S. spanking the children.

{¶ 61} Flynn stated that another referral came in alleging that F.S.'s boyfriend had spanked the children. The boyfriend did not live in F.S.'s home but visited her there. She stated that the agency had conducted a background check of the boyfriend and that he had submitted to drug screens, which were negative. Flynn testified that the agency investigated the spanking allegations against F.S.'s boyfriend. She stated that she spoke with each of the children, F.S., the children's grandmother and Banzhaf regarding the allegations and found them to be unsubstantiated. She indicated that the children all denied any spankings by F.S.'s boyfriend.

{¶ 62} Flynn testified that F.S. moved and bought a larger home for the children and that there were no safety concerns regarding the children's placement with her. She stated that the agency believed it was in R.R.'s best interest to remain

with G.R., for the agency to be granted permanent custody of L.R. and for Dem.C., Z.C. and J.C. to remain with F.S.

{¶ 63} On cross-examination, Flynn acknowledged that the children had been in protective supervision for approximately 18 months in 2018-2020, during which time, the prior case worker visited the family at least twice a month. She stated that, if the prior case worker had seen signs of physical abuse or neglect during that time, she would have expected the prior case worker to have documented it in her notes and/or sought a higher level of care for the children.

{¶ 64} Flynn further acknowledged that, "most times," when a child is seen for a doctor's appointment, the physician will document scars, marks or bruises on the child and that R.R.'s medical records from January and February 2022 (after he was removed from Mother's custody) documented several healed scars to his legs and hypopigmentation that were not documented in medical records from May 2020 (when the children were removed from Mother's care). Flynn indicated that she had not asked R.R. about them because "[h]e didn't say anything about being abused" at that time and that it is "typical" for children to fall and get scars and marks at his age due to the physical activities in which they participate.

{¶ 65} Flynn confirmed that, when the children were triaged after having been removed from Mother's care on May 13, 2020, (1) L.R. denied any abuse and did not have any bruises, injuries or scars, (2) Dem.C. stated that his "aunties" "gave him a whooping" and said nothing about Mother hitting him, (3) Z.C. had some scratches on her chest, which had been documented by the worker of record a few

days earlier and which L.R. claimed was the result of Z.C. having scratched herself, and (4) then-two-year-old J.C. reported nothing. Flynn acknowledged that the worker of record's activity log included an entry dated May 8, 2020 (one week prior to the children's removal) that stated, in part, "Worker of record observed all children to be free of marks and bruises and dressed appropriately," but also noted that "[t]here's a lot in this activity log about the conditions [the children] were in" and that those "conditions" were "pretty bad." Flynn testified that she had never reviewed the children's medical records, pictures or other "specific reports" of physical abuse with Mother.

{¶ 66} Referring to various certificates of completion introduced by Mother, Flynn confirmed that Mother had completed a domestic violence education program in November 2018, parenting classes in 2018 and May 2021, an anger management program in June 2021, intensive and nonintensive outpatient substance abuse treatment in December 2021, a drug and alcohol rehabilitation program in July 2021 and the Greater Cleveland Drug Court program in February 2022. Flynn also confirmed that Mother was actively engaged in mental health services and that there had been no recent domestic violence incidents involving Mother. She further confirmed that Mother had been submitting to weekly drug screens and had tested positive only twice — one positive urine screen for alcohol in December 2021 and one positive toenail screen for methamphetamine in April 2022.

{¶ 67} Referring to documents Mother introduced from the lab that conducted the toenail screen, Flynn acknowledged that the documents indicated

that the detection window for drugs in a toenail screen is approximately 8 to 14 months, that the toenail screen revealed only the presence of methamphetamine in the toenail — which was "conclusive evidence of the environmental exposure of methamphetamine and [did] not provide evidence for the ingestion of methamphetamine" — and that none of Mother's weekly urine screens had tested positive for methamphetamine. Flynn stated that her partner had spoken with medical providers regarding Mother's claim that the positive alcohol test could be attributable to Mother's chemotherapy and that the providers said, "that could be."

{¶ 68} Flynn testified that Mother's home was appropriate for the children.

### Mother's Witness

{¶ 69} Brown, a licensed professional counselor, testified that she began seeing Mother in January 2022. Brown indicated that Mother had been referred to her agency by Moore Counseling for individual counseling as part of her case plan. Brown stated her agency assessed Mother and diagnosed Mother with PTSD and major depressive order and that Brown then worked with Mother to develop a treatment plan. Brown said that she meets with Mother weekly and that Mother is "very engaged" in her therapy.

{¶ 70} Brown testified that they have been working on Mother's coping skills "to challenge negative thoughts and turn them into positive thoughts" and that Mother has been making progress towards her goals. Brown indicated that she was not aware of any outstanding services on Mother's case plan.

{¶ 71} Brown testified that she had only spoken with Flynn twice — both times in the last three weeks. She stated that she attended a zoom meeting on October 7, 2022, the purpose of which — she believed — was to address reunification of Mother with the children based on Mother's treatment plan and the case plan. Brown indicated that the tone of the meeting was "a little aggressive" on the agency's part because the agency sought to get Mother to admit that she had physically abused her children. Brown said that, in response, Mother was "[d]efensive." She indicated that Mother denied abusing her children but admitted to "disciplin[ing] them" and that Mother claimed the agency did not understand "the difference between a beating and a whooping." Brown testified that no clarification was sought during the meeting as to how Mother disciplined the children and that Mother was not given an opportunity to explain what she meant by discipline, i.e., "it was more of her trying to be able to say I did something that I didn't do." Brown stated that she believed there was a "miscommunication" between Mother and the agency and that Mother was "confused about what's gonna really reunite her with her kids."

{¶ 72} Brown testified that Flynn raised the issue of participating in family counseling during the meeting, that Mother responded that she was willing to engage in family counseling and that Flynn indicated that she would make a referral for family counseling but, to her knowledge, had not yet done so.

{¶ 73} Brown testified that, prior to the October 2022 meeting, she had never discussed Mother's alleged physical abuse or discipline of the children with Mother. When shown portions of the medical records reporting scars, marks and/or welts on

R.R., Dem.C. and J.C., Brown acknowledged that such marks were not indicative of ordinary discipline. Brown testified that she had not discussed the medical records with Mother and had no knowledge regarding how any such marks occurred.

### The Guardian Ad Litem's Recommendation

{¶ 74} On October 17, 2022, the children's guardian ad litem submitted a written report in which he recommended that, "due to all the trauma the children have disclosed while in [M]other[']s care," legal custody of Dem.C., Z.C. and J.C. be granted to F.S., that legal custody of R.R. be granted to G.R. and that permanent custody of L.R. be granted to the agency. The guardian ad litem stated that his recommendation was based on interviews with Mother and the CCDCFS social worker, meetings with the children, review of court documents and attending hearings in the case.

{¶ 75} After Mother concluded her presentation of evidence, the guardian ad litem placed his recommendation on the record. He stated that he had last spoken with the children two days prior to the hearing and that the testimony presented at the hearing was "pretty consistent" with what the children had disclosed to him both during his interviews with the children and during the in camera interviews. Although he acknowledged that R.R. had previously wavered between wanting to stay with G.R. and being returned to Mother, the guardian ad litem stated that he believed "there was some manipulation in place," i.e., that Mother had offered R.R. a car if he went back to her. He stated that, most recently, R.R. had confirmed that he wanted to remain with G.R.

**{¶ 76}** The guardian ad litem indicated that he last spoke with Mother several days before the hearing. Although he commended Mother "on working her services and trying to get herself in a better place," he, nevertheless, recommended that G.R. be granted legal custody of R.R., that F.S. be granted legal custody of Dem.C., Z.C. and J.C. and that L.R. be placed in the permanent custody of the agency "due to all the trauma" the children had sustained while in her care. The guardian ad litem stated that he had not personally discussed the physical abuse allegations with Mother because, after hearing about the abuse from the children, "seeing the scarring and the bruising and the marks" and hearing from the agency that Mother had always denied that she had abused the children, he "didn't see how it would progress the situation." The guardian ad litem explained:

> [T]he issue is the trauma that the children sustained while in mom's care and like I said, I commend mom for getting sober, doing the treatment, getting herself in housing, all those great things, but at the end of the day in the best interests of the children from all the trauma they sustained and all the services they are going through, you know, there's no way that these children can be back with mother.

### The Juvenile Court's Decision

**{¶ 77}** On October 27, 2022, the juvenile court issued written journal entries (1) granting permanent custody of L.R. to the agency, (2) granting legal custody of R.R. to his grandmother, G.R., (3) granting legal custody of Dem.C., Z.C. and J.C. to their aunt, F.S. and (4) denying Mother's motion for legal custody of the children.

**{¶ 78}** As to L.R., the juvenile court found, by clear and convincing evidence, that L.R. had been in the temporary custody of CCDCFS for twelve or more months

of a consecutive twenty-two-month period, that reasonable efforts had been made to prevent the removal of the child from the home and to return the child to the home, that L.R. could not be placed with one of her parents within a reasonable time or should not be placed with either parent, that no relatives had been identified who were both willing and able to provide appropriate care for L.R. and that it was in L.R.'s best interest to be placed in the permanent custody of the agency.

**{¶ 79}** As to R.R., Dem.C., Z.C. and J.C., the juvenile court found that the children had been in the temporary custody of CCDCFS for twelve or more months of a consecutive twenty-two-month period, that reasonable efforts had been made to prevent the removal of the children from the home and to return the children to the home, that the children could not be placed with one of their parents within a reasonable time or should not be placed with either parent and that it was in the children's best interest to be placed in the legal custody of their maternal grandmother or aunt.

**{¶ 80}** Mother appealed, raising the following three assignments of error for review:

> Assignment of Error I: The trial court's rulings in case numbers AD18908319, AD18908321, AD18908322, and AD18908323, granting Appellee's Motion to Modify Temporary Custody to Legal Custody, were each an abuse of discretion.
>
> Assignment of Error II: The trial court's ruling in case number AD18908320, granting Appellee's Motion to Modify Temporary Custody to Permanent Custody, was an abuse of discretion.
>
> Assignment of Error III: The trial court's decision to overrule Mother's trial counsel's objection to the case worker's testimony on re-redirect,

regarding alleged prior referrals to DCFS for R.R. as of April 2014, was an abuse of discretion.

{¶ 81} For ease of discussion, we address Mother's assignments of error out of order.

**Law and Analysis**

### The Juvenile Court's Decision to Grant Permanent Custody of L.R. to CCDCFS

{¶ 82} In her second assignment of error, Mother contends that the juvenile court abused its discretion in terminating her parental rights and granting permanent custody of L.R. to the agency.

{¶ 83} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 84} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368,

776 N.E.2d 485, ¶ 14, it is "an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986)

### Standard for Terminating Parental Rights and Granting Permanent Custody of L.R. to CCDCFS

{¶ 85} R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile court may grant a public child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the following circumstances exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the

temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1).

**{¶ 86}** "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

**{¶ 87}** "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118

(1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

**{¶ 88}** In this case, the agency moved for permanent custody of L.R. pursuant to R.C. 2151.414(B)(1)(d). In its closing argument, the agency alternatively argued that permanent custody was warranted under R.C. 2151.414(B)(1)(a). The juvenile court found that L.R. had been in the temporary custody of CCDCFS "for twelve or more months of a consecutive twenty-two-month period" and further found that L.R. could not be placed with Mother or her father within a reasonable time and should not be placed with either of them.

**{¶ 89}** Mother does not dispute that CCDCFS met its burden of establishing that one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) existed as to L.R. Mother challenges only the juvenile court's best-interest determination. Mother contends that the juvenile court abused its discretion in determining that granting permanent custody to the agency and terminating her parental rights was in L.R.'s best interest.

## Best-interest Determination

**{¶ 90}** R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest,[7] the court "shall consider all relevant factors," including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

**{¶ 91}** The best-interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59. Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors to decide whether granting an agency permanent custody of a child is in that child's best interest. A juvenile court has considerable discretion in

---

[7] In addition to the best-interest factors identified in R.C. 2151.414(D)(1), R.C. 2151.414(D)(2) sets forth a list of circumstances that, if all are found to exist, mandates a finding that permanent custody is in the best interest of the child. "R.C. 2151.414(D)(1) and 2151.414(D)(2) are 'alternative means' for determining whether permanent custody is in a child's best interest." *In re R.D.*, 8th Dist. Cuyahoga No. 111798, 2022-Ohio-4519, ¶ 51, quoting *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 39-40. Because no argument has been made that all of the R.C. 2151.414(D)(2) circumstances exist here and only one of the R.C. 2151.414(D)(1) factors needs to be resolved in favor of the award of permanent custody, we need not address R.C. 2151.414(D)(2) in this appeal. *In re Za.S.*, 8th Dist. Cuyahoga No. 111683, 2023-Ohio-1477, ¶ 60.

weighing these factors. Although the juvenile court is required to consider each statutory factor in determining what is in a child's best interest under R.C. 2151.414(D)(1), no one factor is required to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the factors need be resolved in favor of permanent custody to terminate parental rights. *In re J.C-A*, 8th Dist. Cuyahoga No. 109480, 2020-Ohio-5336, ¶ 80; *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53.

{¶ 92} We review a juvenile court's determination of a child's best interest under R.C. 2151.414(D)(1) for abuse of discretion. *In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 76, citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47; *see also In re J.B.*, 2013-Ohio-1704, at ¶ 97 ("[T]he discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."). A juvenile court abuses its discretion where its decision is unreasonable, arbitrary or unconscionable. *In re R.D.*, 2022-Ohio-4519, at ¶ 49, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A decision is unreasonable if there is "'no sound reasoning process that would support that decision.'" *In re C.D.Y.*, 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4987, ¶ 8, quoting *Baxter v. Thomas*, 8th Dist. Cuyahoga No. 101186, 2015-Ohio-2148, ¶ 21. A decision is arbitrary if it is made "'without consideration of or regard for facts [or]

circumstances.'" *In re C.D.Y.* at ¶ 8, quoting *Black's Law Dictionary* 125 (10th Ed.2014).

{¶ 93} Mother contends that the juvenile court abused its discretion in determining that permanent custody was in L.R.'s best interest because (1) Mother had "completed her case plan objectives" with respect to substance abuse and mental health services — the only specific concerns the agency had raised with respect to L.R., (2) L.R. was alleged to have been sexually abused when living with her father, R.S., not when living with Mother, (3) there was no evidence that Mother had physically abused L.R., (4) the agency did not present evidence "as to how the visits between Mother and L.R. were going" or "as to L.R.'s wishes regarding her placement" and (5) Mother's "successful[] complet[ion] [of] her case plan objectives" combined with her "ongoing efforts" at substance abuse treatment and monitoring and counseling "demonstrate[d] that L.R. could have received a 'legally secure placement' without a grant of permanent custody to the agency." We disagree.

{¶ 94} The record reflects that the juvenile court considered each of the relevant R.C. 2151.414(D)(1) factors in determining that an award of permanent custody to the agency was in L.R.'s best interest. In its October 27, 2022 journal entry, the juvenile court identified the factors it considered as follows:

> Upon considering the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate

orders of disposition for twelve (12) or more months of a consecutive twenty-two (22) month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

The juvenile court also found that "[n]o relatives have been identified who are both willing and able to provide appropriate care for the child."

**{¶ 95}** In determining that L.R. could not be placed with one of her parents within a reasonable time or should not be placed with either parent, the juvenile court further found, as it relates to Mother:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the mother and father to remedy the problems that initially caused the child to be placed outside the home, the mother and father have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

Mother has a chronic mental illness that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one (1) year after the Court holds the hearing in this matter.

* * *

Mother has committed abuse or neglect to the child and the child's siblings and the likelihood of recurrence of the abuse or neglect makes the child's placement with the parent a threat to the child's safety.

**{¶ 96}** The juvenile court also found, with respect to the services provided by the agency and the reasons those services were not successful, that "Mother has completed some services but has demonstrated physical abuse to siblings of the child."

{¶ 97} Following careful consideration of the evidence presented at the permanent custody hearing and the transcript of the juvenile court's June 13, 2022 in camera interview of L.R., we cannot say that the juvenile court abused its discretion in weighing the relevant factors under R.C. 2151.414(D)(1) and concluding that granting permanent custody to the agency was in L.R.'s best interest. Competent, credible, clear and convincing evidence supports the juvenile court's findings related to Mother's physical abuse or neglect of L.R. and her siblings and its ultimate best-interest determination.[8]

{¶ 98} Although it is undisputed that Mother completed most, if not all, of her case plan services, "substantial compliance" with case plan services is not, in and of itself, "dispositive" and "does not preclude a grant of permanent custody to a social services agency." *In re J.B.*, 2013-Ohio-1704, at ¶ 90, citing *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.); *see also In re R.D.*, 2022-Ohio-4519, at ¶ 59.

{¶ 99} Simply because a parent completes the services identified in a case plan does not mean he or she has achieved the objectives of the case plan or has substantially remedied the conditions that caused the child to be removed. *In re*

---

[8] There is limited information in the record regarding Mother's mental illness and its impact on her parenting of the children. Although the parties have not raised the issue, it does not appear that the juvenile court's finding that "Mother has a chronic mental illness that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one (1) year after the Court holds the hearing in this matter" is adequately supported by the record. However, because the record otherwise supports the juvenile court's permanent custody determination, we do not further address the issue here.

*J.B.* at ¶ 90. "'The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'" *Id.*, quoting *In re McKenzie*, 9th Dist. Wayne No. 95CA0015, 1995 Ohio App. LEXIS 4618, 11 (Oct. 18, 1995).

{¶ 100} In this case, L.R. was placed in the temporary custody of the agency after Mother relapsed and it was discovered that the children had been physically abused while in Mother's care. At the time of the hearing, L.R. had been in agency custody for more than two years.

{¶ 101} Contrary to Mother's assertion, evidence was presented that L.R. had been abused while in Mother's custody. Although certain of the medical records admitted into evidence contain entries suggesting that L.R. herself may not have been physically abused by Mother, as detailed above, Mason, L.R.'s therapist, testified that L.R. told her that Mother had "locked" L.R. and her siblings in a room "for hours at a time, a long, long time" without food and that, while in Mother's care, she had also been "whooped" with a belt. The juvenile court also heard from L.R. directly during the in camera interview regarding her experiences while in Mother's care and her relationship with Mother.

{¶ 102} Further, even if there had been no evidence that L.R. had been physically abused by Mother, the agency presented ample competent, credible evidence, based on the testimony of Banzhaf, Flynn and the medical records, to support the juvenile court's finding that Mother had physically abused and neglected L.R.'s siblings (and that L.R. had observed that abuse) by (1) hitting the

children with belts causing significant bruising, marks or welts, (2) locking the children in a room for hours at a time without access to adequate food or bathroom facilities and (3) leaving the younger children strapped into high chairs for extended periods of time. Mason testified regarding the trauma L.R. experienced as a result of Mother's physical abuse and the continuing effects of that trauma. Based on the evidence presented, the juvenile court reasonably concluded that placement with Mother would pose "a threat to [L.R.'s] safety." The record reflects that Mother has refused to even acknowledge that any abuse occurred, denying that she ever locked her children in a room and consistently downplaying the abuse as "proper" "whoopings" rather than "beatings." There is nothing in the record to suggest that Mother would be able to appropriately parent and provide a safe, secure and stable home for L.R. that meets her needs at any reasonable time in the future.

{¶ 103} Likewise, although Mother contends that no evidence was presented at the hearing regarding Mother's visitation with L.R. or L.R.'s wishes regarding placement, the record reveals otherwise. As detailed above, Flynn testified regarding L.R.'s visits with Mother. Mason testified that L.R. told her that she "never wants to go back home again" because of "[w]hat [Mother] did to us." The guardian ad litem stated that the testimony presented at the hearing was "consistent" with what the children had communicated to him regarding their wishes and L.R.'s counsel clearly stated in her closing argument that it was "[L.R.'s] desire to be placed in permanent custody of the [a]gency so that she can remain with

her current foster mother." In addition, the juvenile court judge heard from L.R. regarding her wishes during his in camera interview of L.R.

{¶ 104} "A child's best interests require permanency and a safe and secure environment." *In re E.W.*, 8th Dist. Cuyahoga Nos. 100473 and 100474, 2014-Ohio-2534, ¶ 29. Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," the "paramount consideration" is always the best interest of the child. *In re J.B.,* 2013-Ohio-1704, at ¶ 111.

{¶ 105} Based on the record before us, we cannot say that the juvenile court acted unreasonably, arbitrarily or unconscionably in determining that it was in L.R.'s best interest to grant permanent custody to the agency. The record reflects that the juvenile court carefully considered and weighed all of the relevant factors in determining that permanent custody was in L.R.'s best interest. The juvenile court's best-interest determination is supported by competent, credible, clear and convincing evidence.

{¶ 106} Accordingly, the juvenile court did not abuse its discretion in granting permanent custody of L.R. to CCDCFS. Mother's second assignment of error is overruled.

### The Juvenile Court's Decisions Granting Legal Custody of R.R., Dem.C., Z.C. and J.C. to Other Relatives

{¶ 107} In her first assignment of error, Mother contends that the juvenile court abused its discretion in granting legal custody of R.R. to G.R. and legal custody of Dem.C., Z.C. and J.C. to F.S. Mother contends that the juvenile court's decision

was not supported by a preponderance of the evidence and was not in the best interest of the children because (1) there were "reasons to doubt the children's credibility with respect to the allegations [of physical abuse] against Mother," (2) Mother had completed, or had "at least made substantial progress on, all of her case plan objectives," (3) there was "minimal evidence" of Mother's drug use, (4) Mother had cooperated with the agency and complied with weekly drug screens, (5) there were no concerns regarding Mother's engagement in mental health counseling and (6) Mother "showed up for every visit" with her children.

### Standard for Determining Legal Custody

{¶ 108} As an alternative to an award of permanent custody, a juvenile court may award legal custody of an abused, neglected or dependent child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings." R.C. 2151.353(A)(3). "Legal custody" is

> a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(21). A person identified in a complaint or motion filed by a party to the proceedings as a proposed legal custodian must comply with various statutory

requirements, including signing a statement of understanding for legal custody. R.C. 2151.353(A)(3).

{¶ 109} Legal custody is "significantly different" than the termination of parental rights. *In re K.L.V.W.*, 8th Dist. Cuyahoga No. 112067, 2023-Ohio-1287, ¶ 30. Unlike an award of permanent custody, "[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus. When a parent loses legal custody of his or her child, the parent "retains residual parental rights, privileges and responsibilities and is not permanently foreclosed from regaining custody." *In re M.S.*, 8th Dist. Cuyahoga No. 108567, 2019-Ohio-5128, ¶ 32; R.C. 2151.353(A)(3)(c). Nevertheless, an order granting legal custody of a child to another is "intended to be permanent in nature." R.C. 2151.42(B) ("An order of disposition issued under division (A)(3) of section 2151.353 * * * granting legal custody of a child to a person is intended to be permanent in nature. A court shall not modify or terminate an order granting legal custody of a child unless it finds, based on facts that have arisen since the order was issued or that were unknown to the court at that time, that a change has occurred in the circumstances of the child or the person who was granted legal custody, and that modification or termination of the order is necessary to serve the best interest of the child.").

{¶ 110} The touchstone of a decision regarding legal custody is the best interest of the child. *See, e.g., In re C.S.*, 3d Dist. Paulding No. 11-21-07, 2022-Ohio-

2451, ¶ 20 ("At a dispositional hearing involving a request for legal custody, the focus is on the best interest of the child."); *In re A.P.*, 9th Dist. Summit No. 30056, 2022-Ohio-276, ¶ 7 ("'Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child.'"), quoting *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12.  Where a juvenile court considers an award of legal custody following an adjudication of abuse, neglect or dependency, "'it does so by examining what would be in the best interest of the child based on a preponderance of the evidence.'"  *In re K.T.*, 8th Dist. Cuyahoga No. 111996, 2023-Ohio-1288, ¶ 33, quoting *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 11.  Thus, we apply a "preponderance of the evidence" standard when reviewing a juvenile court's factual findings on a request for legal custody.  *In re W.A.J.*, 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604, ¶ 2; *In re O.P.*, 8th Dist. Cuyahoga No. 109355, 2020-Ohio-4835, ¶ 12 (lesser preponderance of the evidence standard is appropriate in legal custody cases because "'legal custody where parental rights are not terminated is not as drastic a remedy as permanent custody'"), quoting *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7.  A "preponderance of the evidence" means evidence that is "'more probable, more persuasive, or of greater value.'"  *In re C.V.M.* at ¶ 7, quoting *In re D.P.*, 10th Dist. Franklin No. 05AP-117, 2005-Ohio-5097, ¶ 52.

{¶ 111} The decision whether to grant or deny a request for legal custody is within the sound discretion of the juvenile court.  When reviewing a juvenile court's

"'ultimate decision on whether the facts as determined would make it in the child's best interests to be placed in legal custody,'" we apply an abuse of discretion standard. *In re W.A.J.* at ¶ 2, quoting *In re G.M.*, 2011-Ohio-4090, at ¶ 14.

{¶ 112} Unlike permanent custody cases — in which the juvenile court must generally consider the factors outlined in R.C. 2151.414(D) — there is no "specific test or set of criteria" that must be applied or considered when determining what is in a child's best interest on a motion for legal custody. *In re S.G.*, 8th Dist. Cuyahoga No. 108711, 2020-Ohio-4060, ¶ 24; *In re C.D.Y.*, 2019-Ohio-4987, at ¶ 10. However, the best-interest factors set forth in R.C. 2151.414(D)(1) may be "instructive" in making that determination. *See, e.g., In re V.P.*, 8th Dist. Cuyahoga No. 109649, 2020-Ohio-5626, ¶ 32; *In re R.B.*, 2019-Ohio-1656, 136 N.E.3d 42, ¶ 48, 52 (8th Dist.); *see also In re B.D.*, 8th Dist. Cuyahoga No. 105650, 2017-Ohio-8663, ¶ 26 ("In determining the best interest of the child in a legal custody case, the juvenile court should consider all relevant factors, and may look to the factors listed under R.C. 2151.414(D) * * * for guidance."), citing *In re M.B.*, 8th Dist. Cuyahoga No. 105168, 2017-Ohio-7481, ¶ 11.

{¶ 113} Courts have also looked to the best-interest factors set forth in R.C. 3109.04(F) in determining what is in a child's best interest for purpose of a motion for legal custody. *See, e.g., In re C.D.Y.* at ¶ 12; *In re J.O.*, 8th Dist. Cuyahoga No. 87626, 2007-Ohio-407, ¶ 11-12; *see also In re K.S.*, 12th Dist. Warren Nos. CA2019-01-009 and CA2019-02-015, 2019-Ohio-2384, ¶ 37 ("As the paramount concern is the best interest of the child, the court 'should consider the totality of the

circumstances affecting the best interest of the child.'" * * * A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) in determining the best interest of the child."), quoting *In re S.L.*, 12th Dist. Butler Nos. CA2012-07-137 through CA2012-07-142 and CA2012-07-147 through CA2012-07-149, 2013-Ohio-781, ¶ 54. Relevant to the issues in this appeal, those factors include: (1) the wishes of the child's parents regarding the child's care; (2) the wishes and concerns of the child, as expressed to the court; (3) the child's interaction and interrelationships with the child's parents, siblings and any other person who may significantly affect the child's best interest; (4) the child's adjustment to home, school and community; (5) the mental and physical health of all persons involved in the situation and (6) whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child. *See* R.C. 3109.04(F)(1).

{¶ 114} In determining that legal custody was in the children's best interest, the juvenile court considered several relevant factors, including best-interest factors set forth in R.C. 2151.414(D)(1)(a)-(d) and 3109.04(F)(1), and set forth specific findings identifying those factors and explaining its determination that an award of legal custody of R.R. to his maternal grandmother, G.R., and an award of legal custody of Dem.C., Z.C. and J.C. to their aunt, F.S., was in the children's best interest. The juvenile court found that the children had been in the temporary custody of CCDCFS for twelve or more months of a consecutive twenty-two-month period and could not be placed with one of their parents within a reasonable time or

should not be placed with either parent, that R.R. was bonded with G.R. and Dem.C., Z.C. and J.C. were bonded with F.S. and that the wishes of the children, "as expressed directly by the child or through the Guardian ad Litem with due regard for the maturity of the child," were that they remain with G.R. or F.S. The juvenile court further found as to each child, considering "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of legal custody":

> The child deserves a safe and stable environment where all [his/her] needs can be met and [he/she] can thrive. This cannot be achieved with either parent. * * * Additionally, the Court finds that the child was physically abused by mother while in her care and as a result has permanent scar[r]ing on [his/her] body and is currently participating in counseling to address Post Traumatic Stress Disorder.

> Mother has committed abuse as described in ORC 2151.031 against the child and the child's siblings and the Court determines that the seriousness, nature, or likelihood of recurrence of the abuse makes the child's placement with the mother a threat to the child's safety.

{¶ 115} The record supports the juvenile court's findings by a preponderance of the evidence.

{¶ 116} Mother argues that the record did not support a finding that Mother had physically abused the children and that the juvenile court "acted in an arbitrary, unreasonable, and unconscionable manner in assigning weight" to the "counselors' hearsay testimony" regarding the children's claims of physical abuse because (1) there was no clear "timetable for when the alleged acts of abuse occurred," (2) the medical records contained "conflicting reports from the children" regarding the alleged physical abuse, (3) certain of medical records noting marks or scars on the

children were dated after the children had been removed from Mother's care, (4) the children had made "allegations of abuse" against other caregivers and (5) after the children were placed in the care of F.S., "they would have a reason to tell the counselor that Mother, and not F.S., had abused them." We disagree.

{¶ 117} Although the children spoke separately with their counselors, the siblings' descriptions of the abuse by Mother were largely consistent, e.g., descriptions of being hit with a belt or belt buckle or being locked in a room or strapped into a high chair for extended periods of time. The children's counselors, Banzhaf and Mason, testified that the children's description of abuse would "just come up naturally," were expressed in age-appropriate language and, when retold, were "repeat[ed] * * * the same way." The children's medical records include reports of similar claims of abuse, which the children described to multiple, different medical providers, and documented scars, bruises and welts resulting from such abuse. The guardian ad litem stated that the testimony presented at the hearing was "pretty consistent" with what the children had disclosed to him. Further, the juvenile court judge heard from R.R., L.R., Dem.C. and Z.C. directly, during his separate, in camera interviews of the children, regarding their relationship with Mother and what happened while in her care.

{¶ 118} Mother also contends that the juvenile court gave undue weight to the children's wishes regarding whether they should be returned to Mother, particularly given that the children had expressed their wishes after being removed

from Mother's care and while in the care of others who may have influenced the children's wishes.

{¶ 119} There is no evidence in the record that the children's expression of their wishes regarding where they wished to reside was due to manipulation or undue influence by their caregivers. The record reflects that R.R. expressed his desire to live with G.R. both to Flynn and the guardian ad litem. Banzhaf testified that Z.C. and J.C. stated that they enjoyed living with F.S. The guardian ad litem stated, based on his interviews with the children and other factors, that he believed it would be in the best interest of R.R. to be placed in the legal custody of G.R. and in the best interest of Dem.C., Z.C. and J.C. to be placed in the legal custody of F.S. In addition, the juvenile court judge heard directly from R.R., Dem.C. and Z.C. regarding their wishes during his separate, in camera interviews of the children.

{¶ 120} A child's "best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 11, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). At the time of the hearing, the children had been in agency custody for more than two years. During that time, Mother had never acknowledged the physical harm she had caused to her children or the continuing effects of the trauma they had sustained while in her care. As stated above, Mother's efforts to complete case plan services, although commendable, does not mean she has achieved the objectives of the case plan or has substantially remedied the conditions that caused the children to be removed from

her care. Banzhaf testified that Z.C. and J.C. need a caregiver who understands and acknowledges the trauma they have experienced and their need for continuing therapy to process that trauma. Evidence was presented that, in their current placements with G.R. and F.S., the children feel safe and are receiving counseling to address the trauma they experienced while living with Mother. There is nothing in the record to suggest that Mother would be able to appropriately parent and provide a safe home for R.R., Dem.C., Z.C. and J.C. that meets their needs at any reasonable time in the future.

{¶ 121} Based on the record before us, we cannot say that the juvenile court acted unreasonably, arbitrarily or unconscionably. Competent, credible evidence supports the juvenile court's determination that granting legal custody of R.R. to G.R. and granting legal custody of Dem.C., Z.C. and J.C. to F.S. was in the children's best interest.

{¶ 122} Accordingly, we overrule Mother's first assignment of error.

**Scope of Re-redirect Examination**

{¶ 123} In her third assignment of error, Mother contends that the juvenile court abused its discretion in allowing the agency, over her objection, to inquire about prior agency referrals relating to R.R. during its re-redirect examination of Flynn.

{¶ 124} After Mother completed her recross-examination of Flynn, the agency asked Flynn, on re-redirect examination, about testimony she had given during her direct examination relating to prior agency referrals documented in

R.R.'s medical records. Over Mother's counsel's objection, the juvenile court permitted Flynn to testify as follows:

> Q. You *testified earlier* in reviewing [R.R.'s] medical documents that there was a report of his history of medical diagnoses, is that correct?
>
> A. Yes.
>
> Q. And as part of your review of those records *you read out* that as of April of 2014 there had been 12 referrals into DCFS for [R.R.] for various marks and scars and bruising on him, correct?
>
> A. That is correct.
>
> Q. To your knowledge, in 2014 —
>
> [Mother's counsel]: Your Honor, I'm gonna object. This is beyond the scope of my recross.
>
> [Counsel for the agency]: Your Honor, she —
>
> THE COURT: Overruled. Go ahead.
>
> [Counsel for the agency]: Thank you. One final question.
>
> Q. * * * In 2014 do you know in whose care [R.R.] was?
>
> A. His mother.

(Emphasis added.) After this exchange, the agency rested its case.

{¶ 125} Mother argues that her recross-examination was limited to "specific marks" observed on R.R. in May 2020 and whether those marks "occurred in Mother's presence" — "not [about] other unrelated incidents dating back to 2014" — and that the agency's re-redirect examination, therefore, exceeded the scope of Mother's recross-examination. Mother contends that admission of this testimony "severely prejudiced" Mother by making it "more likely that the trier of fact would consider the marks on R.R. to have originated from Mother, rather than F.S. or some

other source," and had "the effect of 'bolstering' statements from the children made to [their] counselors" that Mother had physically abused them.

{¶ 126} The agency responds that the juvenile court properly overruled Mother's objection because on recross-examination, Mother asked Flynn "about scarring on R.R." and whether any of the images of scarring documented in his medical records after he was removed from Mother's care in May 2020 showed "open wounds." The agency contends that the re-redirect examination was simply "a handful of follow-up questions" about whether the agency had ever received reports of physical harm to R.R. while in Mother's care before he came into agency custody.

{¶ 127} Generally, the scope of redirect examination is limited to matters inquired into by the adverse party on cross-examination. *State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 59 (8th Dist.), citing *State v. Thomas*, 8th Dist. Cuyahoga No. 101797, 2015-Ohio-3226, ¶ 41, and *State v. Wilson*, 30 Ohio St.2d 199, 204, 283 N.E.2d 632 (1972); *Thomas v. Thomas*, 2012-Ohio-2893, 974 N.E.2d 679, ¶ 67 (5th Dist.). However, the control of redirect examination is committed to the discretion of the trial judge, and "a reversal upon that ground can be predicated upon nothing less than a clear abuse thereof." *Wilson* at 204; *Thomas,* 2012-Ohio-2893, 974 N.E.2d 679, at ¶ 67; *see also Rucker* at ¶ 59 (observing that "redirect examination is not necessarily limited to subject areas brought out on cross-examination"); *see also Saker Family Trust v. Elio Internatl., Inc.*, 10th Dist. Franklin No. 99AP-945, 2000 Ohio App. LEXIS 2393, 4 (June 6, 2000) ("The trial

court * * * has discretion to allow a witness to testify on redirect examination to facts that might have been elicited during the witness' testimony in chief."). Based on our review of the record, we find no reversible error here.

{¶ 128} Even if the agency's inquiry in its re-redirect examination of Flynn was outside the scope of Mother's recross-examination, Mother has not shown that she was in any way prejudiced as a result. During her re-redirect examination, Flynn was asked, in large part, to reiterate facts identified in her review of medical records relating to R.R. to which she had "testified earlier" during her direct examination. *See* tr. 129-131 and State exhibit No. 23. Although Mother claims that she had no opportunity to address this testimony, Mother did not request the opportunity to ask any further questions of Flynn or to "address it in some other fashion" at the hearing. Ample other evidence supported the juvenile court's decisions; there is nothing in the record to suggest that the juvenile court relied on this testimony in rendering its decision in the case or that the juvenile court's decision would have been different if the testimony had not been admitted. Mother's third assignment of error is overruled.

{¶ 129} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

LISA B. FORBES, J., and
EMANUELLA D. GROVES, J., CONCUR